UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------- **X**
                                     :

STRUCTURED ASSET SALES, LLC,     :
                                       :

            Plaintiff,                :    **Index No. 1:20-cv-4329**

                                       :

       v.                                 :

                                       :    **COMPLAINT**

EDWARD CHRISTOPHER SHEERAN *p/k/a/* :
ED SHEERAN, SONY/ATV MUSIC      :
PUBLISHING, LLC, ATLANTIC        :
RECORDING CORPORATION *d/b/a*    :
ATLANTIC RECORDS, BDI MUSIC LTD., :
BUCKS MUSIC GROUP LTD., THE     :
ROYALTY NETWORK, INC., DAVID PLATZ :
MUSIC (USA) INC., AMY WADGE, JAKE  :
GOSLING, MARK "SPIKE" STENT, STONE :
DIAMOND MUSIC CORP., CHEWIETOURS :
LP, EMI MUSIC PUBLISHING, SONY    :
MUSIC ENTERTAINMENT INC., SONY   :
CORPORATION OF AMERICA, SONY     :
CORPORATION, ANSCHUTZ          :
ENTERTAINMENT GROUP, INC., and DOES :
1 THROUGH 10,                       :
                                         :

            Defendants,            :
--------------------------------------------------------- **X**

## INTRODUCTION

1.     This is an action for willful copyright infringement by Structured Asset Sales, LLC, ("SAS"), an owner of the rights to the musical composition of the #1 international hit song "Let's Get It On."  The "Let's Get It On" musical composition was written and produced by professional songwriters Edward Townsend Jr. and Marvin Gaye Jr. in 1973, and registered with the United States Copyright Office.  Defendant Edward Christopher Sheeran ("Sheeran"), the credited purported writer of the #1 2014-2015 and present international hit song "Thinking Out Loud," along with the other Defendants, copied and exploited, without authorization or credit, the "Let's Get It On" musical composition, to the detriment of SAS.

2.     It is also an action for breach of contract, duty of good faith and duty of trust against Defendants Sony/ATV Music Publishing ("SATV") and Stone Diamond Music Corp. ("Stone Diamond"), for all of the following acts and omissions:

a.     failing, and later refusing, to file one or more applications with the United States Copyright Office for protection of the composition, using sound recordings of the composition as deposit copies once permitted to do so, which would have increased the scope of rights in the "Let's Get It On" musical composition, and which would have inured to the benefit of the beneficial owners of the "Let's Get It On" musical composition, including but not limited to SAS;

b.     failing to require the parties responsible for the creation, recording and distribution of "Thinking Out Loud" to enter into a license with the owners of the "Let's Get It On" musical composition as a precondition to the release of "Thinking Out Loud";

c.     knowingly deciding to allow the release of "Thinking Out Loud," without taking any steps to protect the rights of the beneficial owners of the "Let's Get It On" musical composition;

d.     failing to bring one or more legal actions for copyright infringement in the United States against the parties responsible for the creation, recording and distribution of "Thinking Out Loud," which would have inured to the benefit of the beneficial owners of the "Let's Get It On" musical composition, including but not limited to SAS;

e.     failing to bring one or more legal actions for copyright infringement in the

United Kingdom (which is not constrained by the "deposit copy" rules of the United States Copyright Office), covering all of the members of the European Union, and in other jurisdictions outside of the United States, against the parties responsible for the creation, recording and distribution of "Thinking Out Loud," which would have inured to the benefit of the beneficial owners of the "Let's Get It On" musical composition, including but not limited to SAS; and

f.   deciding, upon information and belief, to put the interests of those who would benefit from the release of "Thinking Out Loud," including Sony/ATV and the balance of the Defendants, ahead of the beneficial owners of "Let's Get It On," including but not limited to SAS.[1]

3.   By their failure to take the foregoing steps and others to enhance protection for "Let's Get It On" and collect licensing fees or copyright infringement damages from those responsible for "Thinking Out Loud," Sony/ATV and Stone Diamond breached one or more contracts of which SAS is a beneficiary, by, *inter alia*, violating the duty of good faith and fair dealing inherent in every contract, as well as the duty of trust that they owed to SAS.

4.   Sony/ATV (and to the extent applicable, Stone Diamond, EMI Music Publishing, Sony Music Entertainment Inc. ("Sony Music"), Sony Corporation of America and Sony Corporation) in particular had a conflict of interest between its obligations to SAS, as successor to "Let's Get It On" songwriter Ed Townsend, and to its own self-interest in supporting the highly-lucrative career of Defendant Sheeran.  Rather than enhancing the protection for, and enforcing the rights of the owners of, the "Let's Get It On" musical composition, they chose to

---

[1] The Stone Diamond entity may have suffered by this decision as well, but as Stone Diamond is wholly-owned by one or more of the Sony defendants this is merely academic.

act in support of Sheeran's career, which represents over $100 million in revenues to date.  By choosing its own interests over those of the owners of "Let's Get It On," Sony/ATV violated its contractual duties arising under the administration agreements, and engaged in waste of the "Let's Get It On" musical composition that it was entrusted to protect, monetize and exploit.

5.     Separately, Stone Diamond – part of the Sony Corporation family of companies – failed to live up to its role as publisher of "Let's Get It On" and failed to live up to its obligations to SAS, as successor to songwriter Townsend, entitling SAS to any additional damages arising from the unjust enrichment of Stone Diamond and its successors and/or assigns.

6.     This case is brought by SAS, a Limited Liability Company based in Los Angeles, California, which invests in and owns rights to thousands of songs and musical compositions and is owned by David Pullman, who is its Founder, Chairman and CEO, as well as the principal of The Pullman Group, LLC, the creator of all Pullman Bonds, including the world famous financial landmark $55 million transaction rated single-A level by multiple ratings agencies Pullman Bond for David Bowie, and Pullman Bond series for the Motown Hit Machine, Holland Dozier Holland, R & B Royalty, Ashford & Simpson, The Godfather of Soul, James Brown and The Isley Brothers, among others.  See **www.pullmanbonds.com** .  SAS is a beneficial owner of one-third of all of the copyright rights of Townsend in all of his catalog of works, including "Let's Get It On."

7.     SAS brings this action for Defendants' infringement of the copyright in the composition of "Let's Get It On," and for all damages arising from that infringement, based on 100% of the ownership of that composition, including 100% of the publishers' share and the writers' share of those rights, less any percentage of rights that are adjudicated in the pending action captioned *Griffin v. Sheeran*, No. 1:17-cv-05221 (S.D.N.Y. July 11, 2017) on behalf of the

plaintiffs and against the defendants in that case.[2]  SAS's claims are supported by the expert analyses of **Music Professor Dr. John Covach, of the Eastman School of Music, University of Rochester College Music Department and University of Rochester Institute for Popular Music, and Music Professor Dr. Walter Everett of the University of Michigan, Ann Arbor**, whose reports are attached hereto and incorporated herein as **Exhibits A and B**.  SAS claims are further supported by the expert analysis of **Music Licensing Expert Daniel Rubin, Esq., of Sample Clearance Limited**, whose report is attached hereto and incorporated herein as **Exhibit C**.

8.      The "Let's Get It On" musical composition was written and produced by Townsend and Gaye in 1973, and is the subject of three copyright registrations, two of which were filed in 1973 and renewed in 2000, and one of which was filed in 2020.  In accordance with the strict regulations of the U.S. Copyright Office at the time, which prohibited the submission of sound recordings as deposit copies for musical compositions, the 1973 registrations used the "lead sheet" sheet music as deposit copies.  The 2020 registration, by contrast, used a sound recording of the 1973 original #1 Billboard hit recording of "Thinking Out Loud" as its deposit copy, following decisions of first impression by the Ninth Circuit Court of Appeals[3] and the United States District Court for the Southern District of New York,[4] both of which held that the scope of copyright protection afforded musical compositions for which sheet music is submitted as deposit copy is limited to the elements of the composition reflected in that sheet music.

9.      "Thinking Out Loud" copies various elements of "Let's Get It On," including but

---

[2] Plaintiffs in that case brought their first action against the defendants in that case on August 9, 2016.  *Griffin v. Sheeran*, No. 1:16-cv-06309.  For purposes of calculating the statute of limitations, the claims in the present case relate back to no later than that initial filing date.

[3] Opinion *en Banc*, *Skidmore v. Zeppelin*, No. 16-56057, No. 16-56287, 952 F.3d 1051 (9th Cir. Mar. 9, 2020).

[4] Opinion & Order on Defendants' First Motion *in Limine*, *Griffin v. Sheeran*, 17 Civ. 5221 (LLS) (S.D.N.Y. Mar. 24, 2020)

not limited to the melody, rhythms, harmonies, drums, bass line, backing chorus, tempo, syncopation and looping.  Plaintiff brings this action for copyright infringement under 17 U.S.C. §101, 501 *et seq.,* arising from the Defendants' unauthorized reproduction, distribution and/or public performance of the infringing composition.

10.     As a result, every copy of each of the various versions of Sheeran's recording of "Thinking Out Loud" infringe the musical composition "Let's Get It On," as do any downloads, streams or music videos of "Thinking Out Loud."

11.     Likewise, every time Sheeran performed or performs "Thinking Out Loud" in concert, he has infringed the copyright in the musical composition "Let's Get It On."  Upon information and belief, including www.setlist.fm, Sheeran has performed "Thinking Out Loud" at least 455 times since 2014.

12.     Indeed on January 15, 2020, the Honorable Louis L. Stanton, United States District Judge, ruled that if "Thinking Out Loud" is an infringement of "Let's Get It On," then Ed Sheeran's performances of "Thinking Out Loud" in concert were not licensed by ASCAP or BMI, and were therefore infringing public performances under the Copyright Act:

> BMI's and ASCAP's blanket licenses conveyed to licensees the authors' rights to perform their songs. They did not convey the consent of any author to play music which infringes his songs. And the licenses do not transform an infringing work into one that "could not, as a matter of law, be infringing."

Opinion & Order, *Structured Asset Sales, LLC v. Sheeran*, 18 Civ. 5839 (LLS) (Jan. 15, 2020).

## JURISDICTION

13.     The Court has subject matter jurisdiction under 28 U.S.C. § 1338(a) because this action arises under the Copyright Act of 1976, 17 U.S.C. § 101, *et. seq.* Federal Courts have exclusive jurisdiction over such claims pursuant to 28 U.S.C. § 1331.

14.     This Court has personal jurisdiction over the enumerated Defendants because they

have directed their activities and marketing of the infringing work to New York residents, and New York residents are able to purchase, download, and stream the infringing compositions and recordings.

15.     Defendants have engaged in systematic and continuous business activities relating to the infringing work. As such, the Defendants have engaged in continuing business activities in the instant jurisdiction.

16.     The instant Defendants are, at a minimum, constructively aware of their continuous and substantial commercial interactions with New York residents.

17.     Defendant Sheeran has performed, and he and the other Defendants have authorized, organized, and promoted performances of the infringing work numerous times in New York.

18.     The Defendants have generated touring and recording revenues from the unauthorized and unlawful exploitation of the infringing work, including receiving substantial revenue from such exploitation in New York. They have advertised the infringing work to New York residents.

19.     The Defendants, individually and collectively, have generated substantial revenue from the exploitation of the infringing work in New York.

20.     New York has a considerable interest in adjudicating disputes wherein New York residents are the target of the harm resulting from exploitation of the infringing work.

21.     Sheeran is a resident and has spent substantial time, including time spent while engaged in copyright infringement, in Los Angeles, California, while working on the album which included "Thinking Out Loud."

22.     Venue is proper in this Judicial District pursuant to 28 U.S.C §1391(b), §1391(c),

and §1400(a), respectively, because the corporate Defendants maintain offices in and are subject to personal jurisdiction in this Judicial District and have committed unlawful acts of infringement in this Judicial District.

## PARTIES

23.     The Plaintiff in this case is a limited liability company owned by its founder, chairman and CEO David Pullman, based in Los Angeles.  It is the owner of one third of the estate assets of Mr. Townsend Jr. Mr. Townsend Jr. died intestate in 2003 and his estate was divided one third to each of his children. One of his children, Clef Michael Townsend, sold his entire share and right in the estate to SAS. That interest was put up for sale by Clef Michael Townsend, and the sale was approved by the probate court in California. Mr. Ed Townsend Jr. was the co-writer of the lyrics of "Let's Get It On" and creator of its musical composition. Plaintiff, with the other heirs of Mr. Townsend Jr., are engaged, among other things, in conducting the business of music publishing and otherwise commercially exploiting the musical composition copyrights of the music of Mr. Townsend Jr. They are either the legal owner of the copyrights or the beneficial owner of the copyright since they share in the proceeds of exploitation of the copyright.

24.     Upon reasonable information and belief, Defendant Edward Sheeran is a musician, singer, songwriter, and producer living in the United Kingdom who does business in New York, individually, and under his company, Gingerbread Man Records. Sheeran was nominated for a Grammy Award for Best Record, Best Performance, and Song of the Year in 2016 for "Thinking Out Loud." He has numerous other awards such as British artist of the year in 2015, Album of the Year in 2015 from BRIT Awards, and Best Male Artist in 2016 from People's Choice Award. Sheeran conducts systematic and continuous business in New York

including, but not limited to, public performances, and selling albums and merchandise to the citizens of New York. The Defendant, Edward Sheeran has reproduced, distributed, and publicly performed the infringing work and sound recording and/or authorized its reproduction, distribution and public performance.  During 2014 through 2018 tours, Sheeran performed "Thinking Out Loud" approximately 146 times in the United States, and 455 times worldwide.

25.     Upon reasonable information and belief, Sony/ATV Music Publishing, LLC is a Delaware limited liability corporation with its principal place of business in New York, New York.  Upon reasonable information and belief, Sony/ATV is the music publisher for "Thinking Out Loud" and administers "Let's Get It On" on a worldwide basis. Sony/ATV has generated substantial revenue from the exploitation of the infringing work. It is in a unique position to have known about and/or participated in the exploitation of either or both works. Its conflicting position made it impossible for it correct the problem.

26.     Upon reasonable information and belief, Atlantic Recording Company d/b/a Atlantic Records is a Delaware corporation with its principal place of business in New York.  Atlantic Records is owned by Warner Music Group Corporation, which also has its principal place of business in New York.  Atlantic Records is responsible for the production, manufacture, distribution, marketing, sale and promotion of "Thinking Out Loud" in the United States.  Warner Music Group Corporation recently announced plans to move forward with an Initial Public Offering.  In its February 6, 2020 filing with the Securities and Exchange Commission, the company repeatedly touted the contributions of Defendant Sheeran to the company:

> Our Recorded Music business, home to superstar recording artists such as **Ed Sheeran**, Bruno Mars and Cardi B, generated $3.840 billion of revenue in fiscal 2019, representing 86% of total revenues. Our Music Publishing business, which includes esteemed songwriters such as Twenty One Pilots,

Lizzo and Katy Perry, generated $643 million of revenue in fiscal 2019, representing 14% of total revenues. We benefit from the scale of our global platform and our local focus.

….

Our Recorded Music business includes music from:

• Global superstars such as **Ed Sheeran**, Bruno Mars, Michael Bublé, Cardi B, Kelly Clarkson, Coldplay, David Guetta, Dua Lipa, Neil Young, Prince, Pink Floyd, David Bowie, Phil Collins, Fleetwood Mac, Tom Petty and The Smiths.

….

The overall increase in Recorded Music revenue was driven by increases in digital revenue and artist services and expanded-rights revenue partially offset by decreases in physical and licensing revenue. Digital revenue increased by $70 million as a result of the continued growth in streaming services and strength of releases, which includes new releases from TWICE and Coldplay as well as carryover success from **Ed Sheeran** and Lizzo.

….

The overall increase in Recorded Music revenue was driven by increases in digital revenue and artist services and expanded-rights revenue, partially offset by decreases in physical revenue and licensing revenue. Digital revenue increased by $324 million as a result of the continued growth in streaming services and a strong release schedule including top seller Meek Mill and carryover success from **Ed Sheeran**, *The Greatest Showman* and Cardi B as well as the adoption of ASC 606.

Available at

https://www.sec.gov/Archives/edgar/data/1319161/000119312520026877/d805716ds1.htm.

27.    Upon reasonable information and belief, BDi Music Ltd. ("BDi") is a music publishing company organized under the laws of the United Kingdom, and whose songwriters include Defendant Amy Wadge ("Wadge"), the co-writer of "Thinking Out Loud."  According to the BDi website, "BDi is administered by Bucks Music Group on a Worldwide basis."  Upon reasonable information and belief, BDi is responsible for the publishing of Wadge's share of "Thinking Out Loud" in the United States.  According to the ASCAP ACE database, the point of contact for BDi in the United States is The Royalty Network, in New York.  According to Defendants' counsel, BDi is the copyright owner of "Thinking Out Loud," and BDi has a

worldwide administration agreement with Defendant Bucks Music Group Ltd. ("Bucks").

28.     Upon reasonable information and belief, Bucks Music Group Ltd. is a music publishing company organized under the laws of the United Kingdom, and which is responsible, on behalf of BDi, for the administration and publishing of Wadge's share of "Thinking Out Loud" in the United States.  According to the Bucks website, Bucks has an office in New York. According to Defendants' counsel, Bucks has a subpublishing agreement with Defendant DPMI, through which DPMI has the right to administer "Thinking out Loud" in the United States.

29.     Upon reasonable information and belief, The Royalty Network, Inc. ("TRNI") is a corporation organized under the laws of the State of New York, with offices located at 224 W 30th St., Room 1007, New York, New York 10001-1077.  According to the ASCAP ACE Database, TRNI is the point of contact for BDi in the United States.  The TRNI website indicates that Bucks Music Group is among its catalogs, and that "Thinking Out Loud" is among the works for which it has the authority to grant licenses.  According to Defendants' counsel, DPMI has contracted with TRNI to administer certain songs, including "Thinking Out Loud," in the United States.

30.     Upon reasonable information and belief, David Platz Music (USA) Inc. is a corporation organized under the laws of the State of New York, with offices located at 224 W 30th St., Room 1007, New York, New York 10001-1077.  According to Defendants' counsel, DPMI has contracted with TRNI to administer certain songs, including "Thinking Out Loud," in the United States.

31.     Amy Wadge is the co-writer (with Sheeran) of "Thinking Out Loud."  Upon reasonable information and belief, Wadge is a citizen of the United Kingdom.  Upon further reasonable information and belief, Wadge collects, and directs others to collect for her, millions

of dollars each year generated from musical compositions and recordings in the United States to which she holds rights, including "Thinking Out Loud." Upon further reasonable information and belief, Wadge is a member of PRS For Music ("PRS"), the UK-based performing rights society, and has registered her musical compositions, including "Thinking Out Loud" with PRS. Upon further reasonable information and belief, Wadge has affirmatively selected the American Society of Composers and Authors ("ASCAP") to collect revenues on her behalf in the United States that are generated from the musical compositions to which she holds rights, including "Thinking Out Loud," and ASCAP does in fact collect millions of dollars on behalf of Wadge every year. Upon further reasonable information and belief, Wadge has affirmatively selected Soundexchange, Inc. ("Soundexchange") to collect revenues on her behalf in the United States that are generated from musical recordings to which she holds rights, including "Thinking Out Loud," and Soundexchange does in fact collect millions of dollars on behalf of Wadge every year. Upon further information and belief, Wadge has entered into, and continues to enter into on a regular and persistent basis, contracts and other sophisticated and high-value business arrangements with individuals and entities in the United States in general, and this District in particular.

32.     Jake Gosling is the producer of "Thinking Out Loud." Upon reasonable information and belief, Gosling is a citizen of the United Kingdom. Upon further reasonable information and belief, Gosling collects, and directs others to collect for him, millions of dollars each year generated from musical compositions and recordings in the United States to which he holds rights, including "Thinking Out Loud." Upon further reasonable information and belief, Gosling has affirmatively selected Soundexchange to collect revenues on his behalf in the United States that are generated from musical recordings to which he holds rights, including "Thinking

Out Loud," and Soundexchange does in fact collect millions of dollars on behalf of Gosling every year.  Upon further information and belief, Gosling has entered into, and continues to enter into on a regular and persistent basis, contracts and other sophisticated and high-value business arrangements with individuals and entities in the United States in general, and this District in particular.

33.     Mark "Spike" Stent is credited as the mixer of "Thinking Out Loud."  Upon reasonable information and belief, Stent is a citizen of the United Kingdom, and divides his work time between the United Kingdom and Los Angeles, California.  Upon further reasonable information and belief, Stent collects, and directs others to collect for him, millions of dollars each year generated from musical compositions and recordings in the United States to which he holds rights, including "Thinking Out Loud."  Upon further reasonable information and belief, Stent has affirmatively selected Soundexchange to collect revenues on his behalf in the United States that are generated from musical recordings to which he holds rights, including "Thinking Out Loud," and Soundexchange does in fact collect millions of dollars on behalf of Stent every year.  Upon further information and belief, Stent has entered into, and continues to enter into on a regular and persistent basis, contracts and other sophisticated and high-value business arrangements with individuals and entities in the United States in general, and this District in particular.

34.     Stone Diamond Music Corp. ("Stone Diamond") is the copyright owner of the "Let's Get It On" musical composition.  Stone Diamond was one of two original owners of the composition listed on the 1973 registrations.  Upon information and belief, Stone Diamond purchased the other half of the copyright and publishing rights of original co-owner Cherritown Music Co. Inc., making Stone Diamond the 100% copyright owner and publisher of the

13

composition.

35.     Upon reasonable information and belief, Chewietours LP is a United Kingdom entity that collects money on Sheeran's behalf from music concert performances, and collected money for concert performances in 2014 through 2018 tours, during which Sheeran performed "Thinking Out Loud" approximately 146 times in the United States, and 455 times worldwide. Upon further reasonable information and belief, Chewietours LP is wholly-owned by Sheeran.

36.     EMI Music Publishing is based in New York, New York, and is now wholly-owned by Sony/ATV Music Publishing LLC.  The ongoing corporate status of EMI Music Publishing is unknown to Plaintiff at this time, but it is clear that whatever form it now occupies, both EMI Music Publishing and Stone Diamond are fully encompassed within one or more of Sony/ATV Music Publishing LLC, Sony Music Entertainment Inc., Sony Corporation of America and Sony Corporation.

37.     Sony Music Entertainment Inc. is a Delaware corporation based in New York, New York, wholly-owned by Sony Corporation of America, and the owner of Sony/ATV Music Publishing LLC.

38.     Sony Corporation of America is a New York corporation based in New York, New York, wholly-owned by Sony Corporation, and the owner of Sony Music Entertainment Inc.

39.     Sony Corporation is a Japanese company based in Tokyo, Japan, and the owner of Sony Corporation of America.

40.     Anschutz Entertainment Group, Inc. ("AEG") is a Colorado corporation, with its principal office at 800 W. Olympic Blvd, Ste. 305, Los Angeles, CA 90015.  AEG was the promoter of Sheeran's 2014 through 2018 tours, during which Sheeran performed "Thinking Out

Loud" approximately 146 times in the United States, and 455 times worldwide.

41.     Plaintiff is ignorant of the true names and capacities, whether individual,
corporate, associate or otherwise, of defendants Does 1 through 10, inclusive.  Plaintiff is
informed, believes and thereon alleges that each fictitious defendant was in some way
responsible for, participated in, contributed to the matters and things of which Plaintiff
complains herein, including but not necessarily limited to the creation, recording, distribution or
administration of "Thinking Out Loud," and in some fashion has legal responsibility therefore.
When the exact nature and identity of such fictitious defendants' responsibility for, participation
in, and contribution to the matters and things herein alleged is ascertained by Plaintiff, Plaintiff
will seek to amend this Complaint and all proceedings herein to set forth the same.


## FACTS

42.     The musical composition, "Let's Get It On", (the "Work") was written by Marvin
Gaye Jr. ("Gaye") [the copyright registration lists only Townsend as the author] and Edward
Townsend Jr. ("Townsend").  The composition was registered for copyright in 1973 under
EU422281 and EP314589, and copyright was automatically renewed in 2000 under RE
0000848835 and RE 0000840063.  The 1973 copyright registrations used sheet music of the
composition as the deposit copies filed with the United States Copyright Office.

43.     The composition was registered again on April 14, 2020, using the 1973 original
hit #1 Billboard single sound recording of the composition, performed by Gaye, identified as
TAMLA 54234, as the deposit copy filed with the United States Copyright Office.  The 2020
registration received registration number PA0002238083.

44.     It remains Plaintiff SAS's view that the scope of the 1973 copyright registrations
for the composition is not limited to the sheet music submitted as deposit copies to the United

States Copyright Office.  With the additional registration of the composition in registration number PA0002238083, using the hit Billboard #1 single original 1973 sound recording as deposit copy, there is no question that the scope of protection for the composition includes everything contained within the sheet music submitted in 1973, and the 1973 "Let's Get It On" original hit sound recording, filed and protected as of the year of creation, 1973.

45.     A recording of the song was later made by Gaye, in 1973.  As a co-author of the Work, Mr. Edward Townsend Jr. co-owned the copyright and shared in the proceeds of the exploitation of the work, through record sales, public performance, synchronization and other uses of the Work.  Plaintiff SAS is one of the co-owners of the copyright in the Work through its purchase of all the rights from Clef Michael Townsend, one of the three children of Edward Townsend Jr., approved by California probate court.

46.     The harmonic, melodic, and rhythmic elements of composition in "Let's Get It On" have made this song one of the most famous songs in R&B and soul and popular music history. "Let's Get It On" has been anthologized by celebrated music producers and ranked as one of the top greatest breakbeats of all time. It has been covered by a number other musical performers.

47.     "Thinking Out Loud" was released as part of Sheeran's "X" album on June 20, 2014, and as a single on September 24, 2014.

48.     Sheeran experienced a sharp and sudden rise as an international music star in less than eighteen (18) months, as a direct result of the commercial success of the release of "Thinking Out Loud", the lead single in the United States from Sheeran's debut album, "X", of which "Thinking Out Loud" was the hit.

49.     In 2019, an Elektra Music Group (part of Warner Music Group Corporation)

executive told Billboard Magazine about the impact of "Thinking Out Loud" on Sheeran's

career:

> "This was the song that broadened his appeal and his fan base," Elektra Music
> Group co-president Gregg Nadel, who has overseen each of Sheeran's album
> marketing campaigns, says of "Thinking Out Loud." "He's a singer-
> songwriter, and these types of songs [are] the heart of what he does. The first
> record [appealed to] a younger demo. With 'Thinking Out Loud,' you started
> to see everyone coming to shows -- parents and their kids."

Billboard Magazine, "Songs That Defined the Decade: Ed Sheeran's 'Thinking Out Loud'"

(Nov. 21, 2019) (available at https://www.billboard.com/articles/columns/pop/8543894/ed-

sheeran-thinking-out-loud-songs-that-defined-the-decade).

50.    Not long after its release, many people began commenting on the similarities

between "Thinking Out Loud" and "Let's Get It On."  Indeed, this was the subject of a March

11, 2015 article in *Spin Magazine* entitled "'Blurred Lines' Isn't Even the Biggest Marvin Gaye

Ripoff This Decade: Ever heard Ed Sheeran's 'Thinking Out Loud'?"  (available at

https://www.spin.com/2015/03/marvin-gaye-robin-thicke-blurred-lines-lawsuit-ed-sheeran-

thinking-out-loud/), which included such statements as the following:

> That's all troubling enough, though it's unlikely that this verdict will have such
> extreme implications for cases long since passed. But what really makes you
> wonder about the wide-reaching effect of this decision is when you consider
> that however much of a plagiarism "Blurred Lines" is of Gaye's, it's not nearly
> as egregious a steal as *another* contemporary pop smash: Ed Sheeran's
> "Thinking Out Loud."

> "Thinking Out Loud" is a very nice ballad, one whose seductive groove,
> sentimental lyric, and full-hearted vocal has taken it all the way to No. 1 on
> Billboard's Pop Songs chart. It is also an incredibly obvious successor to
> Marvin Gaye's 1973 superlative slow jam "Let's Get It On" — the gently
> loping four-note bass pattern and crisp '70s soul drums absolutely smack of the
> Gaye classic, as do the embrace-insistent lyrics and general candlelit-bedroom
> feel. The similarity has been pointed out by pages and pages' worth of
> YouTube mashups and covers, and even by Sheeran himself, who has blended
> the two songs in live performances. Personally speaking, I didn't even notice
> the similarity between "Blurred Lines" and "Got to Give It Up" until it was

pointed out to me, but the second I first heard the bass drop in "Thinking," I was overcome with the urge to buy Levi's.

51.     The author of the *Spin Magazine* article, in writing "even by Sheeran himself," is referencing the YouTube video available at https://youtu.be/RxZjVZKVN7k, which was uploaded November 20, 2014, in which Sheeran performs "Let's Get It On," in the midst of performing "Thinking Out Loud."

52.     Upon information and belief, counsel for the plaintiffs in the *Griffin* matter provided the *Spin* article to Sony/ATV, and spoke to Sony/ATV about their claims, within days of the article's publication.

53.      "Thinking Out Loud" infringes "Let's Get It On."  This case seeks damages for Defendants' willful copyright infringement.


**COMPARISON OF THE TWO SONGS: ANALYSIS OF PROFESSOR JOHN COVACH**

54.     Plaintiff adopts as its allegations of fact the analysis set forth in the attached report of Professor Jonathan Covach, attached hereto and incorporated herein as **Exhibit A**, and detailed in the following paragraphs.

**Preamble: Sources and Objective**

55.     The following section undertakes a detailed music-analytical study of two musical works:

   a.   "Let's Get It On" musical composition, reflected in:

      i.   the sheet music, submitted to the United States Copyright Office in 1973 in connection with Copyright Registrations EU422281 and EP314589, renewed in 2000 as RE 0000848835 and RE 0000840063, respectively; and

    ii.  the studio recording of Marvin Gaye's "Let's Get It On" (45 rpm

single, Tamla T 54234F, released 1973, submitted to the United States

Copyright Office in 1973 in connection with Copyright Registration

N: 7555, renewed as RE0000860111)[5]; and

    iii.  b) the studio recording of Ed Sheeran's "Thinking Out Loud" (released

on Asylum-Atlantic in 2014).[6]

56.    The objective herein is to analyze and identify any significant similarity between

the two works through the use of standard and commonly-used methods of technical musical

analysis.

57.    The following analysis will demonstrate that the strong and marked similarity

arises through the use in both works of a combination of a certain chord progression with a

certain bass line, as well as through the shared rhythmic articulation of this chord progression-

bass line combination, referred to as the "backing pattern."

58.    This backing pattern is present in most of the measures in each work. The

similarity between the two musical works is further reinforced by distinct parallels in the

melodies that exist between the two and the use of similar tempos in the recorded versions under

consideration here.

59.    The concept of "stylistic commonplace" will be employed to establish that the

Sheeran recording utilizes material from the Gaye-Townsend composition in ways that are

distinctive and are not the result of general stylistic practice.

## Primary Aspects of Similarity

---

[5] "Let's Get It On" was written by Marvin Gaye and Ed Townsend. The sheet music was published by Jobete Music Company and Cherritown Music Company in 1973.

[6] "Thinking Out Loud" was written by Ed Sheeran and Amy Wadge. The sheet music was published by Sony/ATV Music Publishing Limited UK and BCI Music Ltd. in 2014.

60.     The two works share a distinctive combination of musical materials, designated in herein as the backing pattern; it is comprised of a coordination of harmony (chord progression), bass line, and rhythm.

61.     The backing pattern as it occurs in these two works refers to a combination of music played from the sheet music by a competent musician, as well as the equivalent combination as it is played by the drums, bass, and guitar and/or keyboards in the recordings.

62.     In the case of both recordings considered here, this combination of instruments functions as the accompaniment to the vocal line, and it is not crucial that the instruments from each track be identical—the emphasis for this report is on the function of the backing pattern, which is essentially present to support the vocal line.[7]

63.     When played from the sheet music by, for example, a solo pianist, the backing pattern is likewise present as the accompaniment to the vocal melody.[8]

64.     This backing pattern held in common between the two works can be seen in the first four measures of the sheet music, and heard at 0:00-0:07 in the Gaye recording and at 0:00-0:06 of the Sheeran recording.

65.     After its initial appearance in each song, this pattern is repeated many times during both works, becoming a major element in each song and forming a distinctive accompaniment to the vocal melody in each case.

## Chord Progression

---

[7] Another annotation or recording of either of these tunes could articulate the backing pattern using a range of various instrumental combinations, and indeed, this is often the case with cover versions (which, of course, require artists to license content from the copyright holder). It often happens that multiple versions of a single song will be available even from the original artist, especially when live versions are taken into account. In each of these cases, the specific instrumentation may vary while the backing pattern remains intact.

[8] When performed by a single pianist, the vocal melody need not be sung, as anyone who has heard a cocktail pianist knows. For the purposes of this analysis, it makes no difference whether the melody is sung or played instrumentally.

66.     The distinctiveness of this backing pattern arises in part from the harmony, or "chord progression" that it articulates. In music theoretical terms, we hear the "tonic" chord (designated as "I") with the first scale degree in the bass, followed by a chord with the third scale degree in the bass, then the "subdominant" chord (or "IV") with the fourth scale degree in the bass, and finally the "dominant" chord (or "V") with the fifth scale degree in the bass.[9]

67.     Gaye and Townsend's "Let's Get It On" is based a chord progression formed by the chords E-flat, G minor, A-flat, and B-flat. Musicians commonly assign roman-numeral labels to chords in order to specify their harmonic function, and these numerals are based on the position of each chord with regard to the scale in use. The chord build on the first note of the scale—a C note in C major, for instance—will be labeled "I."  In a similar manner, those based on the second, third, fourth, fifth, six, and seventh notes will be labeled "ii," "iii," "IV," "V," "vi," and "vii[0]" respectively (note that upper-case numerals are used for major chords and lower-case numerals for minor chords).[10]

68.     This system of labeling is so common that there is almost no student who studies music in North America who does not learn these numerals at some point in his/her training.

69.     Using this system, the chord progression employed in the backing pattern of Gaye and Townsend's song may be written as I – iii – IV – V (see example 1a).

70.     This is a very common progression, used in many songs, and by itself—as an isolated entity—does not constitute an element that one could copyright in most cases.

---

[9] Another annotation or recording of either of these tunes could articulate the backing pattern using a range of various instrumental combinations, and indeed, this is often the case with cover versions (which, of course, require artists to license content from the copyright holder). It often happens that multiple versions of a single song will be available even from the original artist, especially when live versions are taken into account. In each of these cases, the specific instrumentation may vary while the backing pattern remains intact.

[9] When performed by a single pianist, the vocal melody need not be sung, as anyone who has heard a cocktail pianist knows. For the purposes of this analysis, it makes no difference whether the melody is sung or played instrumentally.

71.     The Sheeran and Wadge work employs a slight adjustment to this chord pattern:

the I, IV, and V chords are maintained from the Gaye and Townsend work, but the iii is replaced

with a common substitute.

72.     As any freshman harmony textbook will attest, the I chord with the third scale

degree in the bass may stand in (or substitute) for the iii chord without affecting the function of

the progression (the bass lines in each recording are discussed in more detail immediately

below).

73.     The Sheeran and Wadge work uses this chord, commonly labeled "$I^6$," as a slight

modification the Gaye and Townsend original (see example 1b), producing a mild variant that is

harmonically equivalent: $I – I^6 – IV – V$. [11]

**Examples 1a (Gaye-Townsend) and 1b (Sheeran-Wadge): chord progressions compared**



74.     In the Gaye-Townsend work this chord progression within the backing pattern

occurs in the key of E-flat, while in Sheeran-Wadge work the progression occurs in D major.

75.     Because of the power of the roman numerals (and scale degrees) to capture the

relationship between the chords in each case, however, listeners will hear the two progressions as

functionally equivalent.

---

[11] The following is drawn from a popular undergraduate harmony textbook: "Although scale-degree 3 in the bass is most often harmonized by $I^6$, it can also be harmonized by a root-position mediant chord.  In this way, iii may substitute for $I^6$ to create a tonic extension . . ." See Steven G. Laitz, *The Complete Musician: An Integrated Approach to Tonal Theory, Analysis, and Listening*, 2nd ed. (New York: Oxford University Press, 2008), p. 446. Laitz, chair of the Department of Music Theory and Analysis at The Juilliard School, uses a musical example drawn from Peter, Paul, and Mary's recording of "Puff the Magic Dragon" to illustrate this point (see p. 447).

76.     Thus, the strong and marked similarity between the use of this progression in Gaye-Townsend and Sheeran-Wadge songs is not significantly affected by the different keys used.

77.     That different keys do not affect the identity of a song is borne out by the fact that singers often change the keys of songs to suit their voices.

78.     In fact, the value to musicians of thinking about chord progressions in the manner described here (employing roman numerals) is that they make it easy to "transpose" (or change the key of) any given song quickly.

79.     Such transposition is considered a basic skill for professional musicians and music educators.

80.     Many listeners will not recognize that Frank Sinatra sang "My Way" in D major, while Elvis Presley sang that song in C major; it is clearly the same song despite the difference in key.

81.     The difference in key between those two versions of "My Way," is actually slightly greater than the difference between the Gaye-Townsend and Sheeran-Wadge songs considered here.

82.     Without a direct A-B comparison of the two, virtually no listener (except the very few who possess perfect pitch—less than 1% of the population) would be able to hear the difference in key between the two songs.

83.     In fact, a vinyl recording of the Sheeran recording running a little fast and one of the Gaye recording running a little slow would meet in the middleground separating the two, making them identical. In short, the backing patterns of these two works use equivalent progressions, with the Sheeran-Wadge work introducing only one minor variation on the Gaye-

Townsend work (see example 1a and 1b for comparison).

**Bass Line**

84.     An important part of why the chord progression sounds the way it does has to do with the notes that comprise the bass line in each song.

85.     As a matter of musical analysis, a bass line is a structural element in the music that can be realized in performance in any number of ways.

86.     In a solo piano or guitar performance, for instance, the bass line will consist of the succession of the lowest sounding notes.

87.     Such a succession of lowest-sounding notes allows us to identify the bass line in Sheeran's accompaniment to his singing on the guitar in the opening moments of his recording, for instance.

88.     In a solo piano performance, the bass line is typically formed by the lowest notes played by the pianist's left hand. In a band setting, the bass line is usually played by the bass guitar, though in some cases the bass line can be played by a keyboard or even some combination of instruments.

89.     In the recording of the Gaye-Townsend work, the bass guitar plays an E-flat to accompany the I chord, and then a G to accompany the iii chord.

90.     The bass then employs an A-flat to support the IV chord, and a B-flat to support the V chord.

91.     This succession of notes on the bass guitar creates a bass line that goes: E-flat – G – A-flat – B-flat (see example 2a).

92.     This bass line is understood by musicians as the scale-degree pattern 1 – 3 – 4 – 5.

93.     Thinking of the bass line as 1 – 3 – 4 – 5 (instead of as specific notes) thus

generalizes the relationship between the notes in a manner similar to that of the I – iii – IV – V pattern mentioned above.

94.     Sheeran's recording of "Thinking Out Loud" employs the bass notes D – F sharp – G – A to accompany its I – I⁶ – IV – V chord progression (see example 2b).

95.     While these specific four notes are seemingly very different from those used by in Gaye's recording, this difference is entirely due to the difference in key; the relationship between scale-degrees 1 – 3 – 4 – 5 remain unaffected by the change of key from E-flat to D: the two bass lines are equivalent. The fact that the bass line is played by bass guitar on the Gaye recording and by the lowest notes on Sheeran's guitar on his recording makes no difference from an analytical perspective.

**Examples 2a (Gaye-Townsend) and 2b (Sheeran-Wadge): bass lines compared**



96.     It should be noted that the sheet music of "Let's Get It On" does not notate a separate bass part.

97.     This sheet music deposit copy is in "lead sheet" format—a form of notation that is extremely common in the notation of popular music.

98.     A lead sheet typically provides the melody notated on the treble clef, with lyrics below and chord symbols above. Example 2c shows the first four measures of the "deposit copy" sheet music for "Let's Get It On."

99.     But even though a bass part is not specified here, any performer must play a bass line of some kind in order to realize the content of the lead sheet.

100.     After all, there must be a lowest-sounding note in any musical realization.

101.     The most direct and basic practice is for the bass line to be formed from the roots of each the chords specified above the melody in the lead sheet.

**Example 2c (Gaye-Townsend): lead sheet showing melody, lyrics, and chord symbols**



102.     Since the chords specified are Eb – G minor – Ab – Bb⁷, the most obvious bass line is simply a succession of the notes Eb – G – Ab – Bb, and this is precisely what the overwhelming majority of musicians would understand the lead sheet to be specifying.

103.     Thus, a specific bass line is indicated by the chord symbols on the lead sheet, even though it is not notated separately.

104.     When we think of Sheeran-Wadge work in terms of the roman numerals as we did with Gaye-Townsend work, the strong similarity between the two songs is further revealed.

105.     The Sheeran-Wadge work employs the identical[12] chord-bass pairing as the Gaye-Townsend work song does: I – I⁶ – IV – V.

106.     Example 2d shows the chord-bass pairing in Gaye and Townsend's "Let's Get It On," and example 2e shows the same pairing in Sheeran's recording of "Thinking Out Loud."

**Examples 2d (Gaye-Townsend) and 2e (Sheeran-Wadge): chord-bass pairings compared**

2d                                                                2e

---

[12] Allowing for the common substitution of I⁶ for iii, as discussed above.



Eb:    I       iii      IV      V          D:      I       I⁶      IV      V

107.    These examples demonstrate that the combination of the chord progression and bass line elements make this similarity even more unique and uncommon than it would be if either element were taken in isolation. The importance of this specific combination of elements is even more strongly reinforced when we consider the rhythm of this chord-bass pair.

**Distinctive Harmonic Rhythm**

108.    There are many ways that musicians think and speak about rhythm. In order to examine the role rhythm plays in the similarity between these two songs, this analysis considers "harmonic rhythm."

109.    The term harmonic rhythm refers to the timing of the chord changes in a song. Gaye and Townsend's "Let's Get It On" sets the I – iii- IV – V chord-bass progression to a distinctive rhythm as shown in example 3a.

110.    This rhythm extends over two measures (or bars) according to a "slow" 4/4 time signature (see below), dividing the duration of the first two chord-bass pairings unevenly, as represented by the dotted quarter and eight note tied to a half note.

111.    The third and fourth chord-bass pairings divide the second measure in a parallel manner to the first measure.

112.    The musical notation of rhythm allows for alternate ways of notating the same rhythm.

113.    A second possible notation for this rhythm is notated below as "fast" 4/4.

27

114.     Note that the eighth notes in the "slow" 4/4 are notated as quarter notes in the "fast" 4/4 version.

115.     Otherwise there is no difference in these two ways of notating the harmonic rhythm of "Let's Get It On: like the words "color" and "colour," they will be indistinguishable in performance—one will not actually be faster or slower than the other.

116.     Most musicians listening to the Gaye recording would notate this rhythm in the "slow" 4/4 version. The Gaye-Townsend sheet music employs the "slow" 4/4 version.

117.     The harmonic rhythm in this sheet music is specified by precise placement of the chord symbols over the rhythms in the melody.

118.     Using the "fast" 4/4 as a guide, note that the Eb chord symbol appears directly over beat 1 in the first measure and the G minor symbol appears precisely over beat 4 in the same measure (see Example 2c, shown here again).

**Example 2c (Gaye-Townsend): lead sheet showing melody, lyrics, and chord symbols**



119.     The Ab chord symbol is placed directly over beat 1 of the third measure while the Bb symbol is placed precisely over beat 4 in that same measure. This precise rhythmic placement of chord symbols is maintained throughout the sheet music submitted as a deposit copy.[13]

Time signature = "slow" 4/4

---

[13] Note that the commercially available sheet music for "Let's Get It On" does not accurately notate the rhythm as played on the recording nor as it appears on the deposit copy. This commercial sheet music has the V chord falling directly on beat 3 of the second measure of the "slow" 4/4 pattern, which is clearly not what happens on the recording nor on the deposit copy of the sheet music. Such discrepancies are common in commercial sheet-music versions of pop songs, which are often prepared with an eye toward producing an arrangement that is easy for the amateur to play. Syncopated rhythms like the one in the Gaye-Townsend work can be more difficult to play, so rhythms can sometimes be "smoothed out" for easier performance and sight-reading.

1      &      2      &      3      &      4      &      |  1      &      2      &      3      &      4
&

I                            iii                              IV                V  (harmonic
pattern)

Time signature = "fast" 4/4

1      2      3      4  |  1      2      3      4   |  1      2      3      4  |  1      2      3
4

I                            iii                              IV            V

**Example 3a (Gaye-Townsend): harmonic rhythm, chord-bass pairing, notated in "slow"**

**4/4**



**Example 3b (Sheeran-Wadge): harmonic rhythm, chord-bass pairing**



120.    Sheeran's "Thinking Out Loud" uses the identical harmonic rhythm as found in

Gaye's "Let's Get It On," and this is shown in example 3b.

121.    Played in an A-B comparison, 3a and 3b make the strong similarity between the two songs abundantly clear.

122.    It does not require an understanding of standard rhythmic notation to see in the sheet music and hear in the music played from it that this rhythm is identical between the two songs.

**Use of Backing Pattern in Song as a Whole**

123.    Having identified the similarity between the backing pattern in the Gaye-Townsend and Sheeran-Wadge works, this analysis explores how often this pattern occurs in the deposit copy sheet music and in the two recordings.

124.    In terms of the use of backing pattern in "Let's Get It On," the sheet music and Gaye's recording are identical; timings from the Gaye recording as used in the following discussion can all be tracked to specific measures in the sheet music.

125.    As Example 4a shows, Gaye-Townsend work begins with a verse-chorus pair (0:00-0:48), following by a pair of verses (0:48-1:34).

126.    All of this music is based on the backing pattern, which occurs 16 times during these sections.

127.    Since the backing pattern is two measures in length, this means that the first 32 measures of the song all feature the backing pattern.

128.    Looking at the rest of the Gaye-Townsend work, we can see that there are, in fact, only two places in the song where the backing pattern is not present, and that is in portions of the bridge, which occurs twice overall on the recording.

129.    Adding up all of the measures of the song, it turns out that there are a total of 84

measures, of which 70 measures employ the backing pattern.

130.    This means that approximately 83% of the Gaye-Townsend work employ the

backing pattern.

**Example 4a (Gaye-Townsend): The overall musical form of "Let's Get It On," indicating the number times the backing pattern appears and showing the percentage of measures that it is present**

| Timing | Section | Description |
|--------|---------|-------------|
| 0:00-0:25 | verse | 8 mm., uses backing pattern (4)*, two beat pick-up |
| 0:25-0:48 | chorus | 8 mm., uses backing pattern (4) |
| 0:48-1:11 | verse | 8 mm., uses backing pattern (4) |
| 1:11-1:34 | verse | 8 mm., uses backing pattern (4) |
| 1:34-2:20 | bridge | 16 mm., mixes backing pattern (3) in with new material |
| 2:19-2:43 | chorus | 8 mm., uses backing pattern (4) |
| 2:43-3:05 | chorus | 8 mm., uses backing pattern (4) |
| 3:05-3:16 | bridge | 4 mm., mixes backing pattern uses only material from last 4 mm. |
| 3:16-3:39 | chorus | 8 mm., uses backing pattern (4), free vocal improv |
| 3:39-4:01 | chorus | 8 mm., fade in bar 5, uses backing pattern (4), free vocal improv |

Total number of measures in song = 84
Total number of measures that employ backing pattern = 70 (83.3%)
Total number of times backing pattern appears = 35

*The numeral 4 in parenthesis indicates that the backing pattern appears 4 times.  Because the backing pattern in two measures in length, four statements of this backing pattern will be eight measures in length.

131.    Example 4b shows the structure of Sheeran and Wadge's "Thinking Out Loud."

Even though the overall form of this work differs from"Let's Get It On," the backing pattern is

present in 64 of the Sheeran and Wadge song's 90 measures, meaning that this specific pattern is

present during about 71% of the song.

132.    It is fair to conclude from this comparison that the backing pattern we have been

discussing forms the basis of both songs, and that this backing pattern plays the same role in the

Sheeran song as it does in the Gaye song.

**Example 4b (Sheeran-Wadge): The overall musical form of "Thinking Out Loud," indicating the number times the backing pattern appears and showing the percentage of measures that it is present**

| 0:00-0:24 | A – verse | 8 mm., uses backing pattern (4)* |
| 0:24-0:49 | A' – verse | 8 mm., new melody, uses backing pattern (4) |
| 0:49-1:13 | B – bridge | 8 mm., new chord progression, new melody |
| 1:13-1:43 | A'' – verse | 10 mm., new melody, uses backing pattern (4) except for last two measures |
| | | |
| 1:43-2:08 | A – verse | 8 mm., uses backing pattern (4) |
| 2:08-2:49 | A' – verse | 8 mm., new melody, uses backing pattern (4) |
| 2:49-2:56 | B – bridge | 8 mm., new chord progression, new melody |
| 2:56-3:27 | A'' – verse | 10 mm., new melody, uses backing pattern (4) except for last two measures |
| | | |
| 3:27-3:51 | A – verse | 8 mm., guitar solo, uses backing pattern (4) |
| 3:51-4:21 | A'' – verse | 10 mm., new melody, uses backing pattern (4) except for last two measures |
| 4:21-4:35 | Ending (tag) | 4 mm., repeats last two bars of A'' two times |

Total number of measures in song = 90

Total number of measures that employ backing pattern = 64 (71.1%)

## Melodic Similarity

133.    We now turn to a comparison of the vocal melody in these two songs. While there are certainly musical features that differ between the two songs overall, there are a several key melodic passages in the Sheeran-Wadge work that are substantially similar to passages in the Gaye-Townsend work.

134.    This can be seen most clearly by comparing the first four measures of "Thinking Out Loud" with the second four measures of eight-bar chorus for "Let's Get It On."

135.    This comparison is shown in examples 5a and 5b. Note that timings are given for the Gaye-Townsend example to make it easier to locate the place in the song example 5a refers to.

136.    The sheet music and recording of the Gaye-Townsend work are identical with respect to melody and thus all timings given can be tracked to specific measures in the sheet music submitted as a deposit copy.

137.    Since the two works are in different keys, the best way to compare the melodies is

32

by using scale-degree numbers; identical numbers shared by notes in different songs mean that

such notes would be the same if both songs were in the same key.[14]

138.    In the first measure of the Gaye-Townsend example (5a), two sequences of scale-

degrees are highlighted by underlining and enclosure within asterisks.

139.    The first of these is the scale-degree sequence 6 5 3 2, and the second is the scale-

degree sequence 3 5 6 5 3.

140.    Note that both of these sequences occur mostly over the first measure of the two-

measure backing pattern.

141.    The Gaye-Townsend example has been notated in "slow" 4/4 to allow easier

comparison with the Sheeran-Wadge work.

142.    Example 5b shows the first four bars of Sheeran's "Thinking Out Loud."

143.    Note that the scale-degree sequences 6 5 3 2 and 3 5 6 5 3 found in "Let's Get It

On" both appear in Sheeran's vocal melody, and also mostly in the first measure of the two-

measure backing pattern.[15]

144.    Thus, while there are important differences between the vocal melodies of these

two works, there are also marked similarities that are crucial to note.

**Example 5a (Gaye): "Let's Get It On," last four measures of chorus (0:37-0:48)**



---

[14] See footnote 4 above.

[15] In Gaye's version of the first of these sequences (6 5 3 2), scale-degree 3 is sung as a flatted 3 (b3)—a typical "bending" of the 3rd scale degree often used in popular music to impart a "bluesy" feel. Note that the sequence 3 5 6 5 3 actually appears twice in the Sheeran-Wadge example, but is only indicated once in Example 5b in order not to clutter the example.

*Example 5b (Sheeran): "Thinking Out Loud," first four measures of song*



**Similar Tempos**

145.     Finally, it should be noted that the tempos of the recordings of these two works are very close: Gaye's recording clocks in at about 83 beats per minute, while Sheeran's sets a slightly slower pace of about 79 beats per minute.

146.     This is a very small difference, especially considering that the two works are in the same time signature of 4/4.

147.     In fact, within this tempo range any particular live performance of either song could vary by 4 beats per minute, thus erasing any difference, no matter how slight.

148.     Similarly to the remarks earlier concerning the differences in key, most listeners could not detect the difference in tempo between the two songs if the songs were not placed in an A-B comparison with one another.

149.     In fact, certain performances in what the listener takes to be a steady tempo can actually include a slight increase (and less often decrease) in tempo over the course of the song without most listeners being aware of it.

150.     It is thus best to think of tempo in terms of a "range of similarity" in which tempos that are within approximately 5% of one another can be considered equivalent (not unlike the way the "margin of error" functions in polling).

151.     Thought of in this way, the slower end of the tempo range for the Gaye recording

overlaps the faster end of the tempo range for the Sheeran one: the two tempos are equivalent.

152.    The Gaye-Townsend sheet music does not specify tempo and so must remain outside the parameter of this particular discussion.

## Stylistic Commonplaces and the Measure of Musical Distinctiveness

153.    There are many musical features in popular music that could never be copyrighted because they are shared within the style so broadly that no author could lay a successful claim to ownership.

154.    Consider the twelve-bar blues, a musical pattern that combines a relatively specific series of chord progressions with a specific rhythmic distribution of those chords within the pattern.

155.    Musicians have written songs based on the twelve-bar blues for many decades, and while specific other qualities of each of these songs can be copyrighted (melodies, distinctive instrumental riffs, lyrics, for instance), the use of the twelve-bar blues pattern in itself cannot be protected.

156.    Such commonly used musical elements like the twelve-bar blues pattern can be termed "stylistic commonplaces"—elements in a style that are in such widespread use within a musical culture that no single author can reasonably claim them to be original.[16]

157.    In identifying musical features of a song and in support of claims of the distinctiveness of the material, it is useful to explore whether the features in question might be considered to be instances of stylistic commonplaces.

---

[16] In classical music, certain commonplaces were prevalent and have been studied extensively by scholars. For instance, Leonard G. Ratner writes: "From its contacts with worship, poetry, drama, entertainment, dance, ceremony, the military, the hunt, and the life of the lower classes, music in the early 18th century developed a thesaurus of *characteristic features*, which formed a rich legacy for composers." See his *Classic Music: Expression, Form, and Style* (New York: Schirmer Books, 1980), p. 9. In this classical music, the originality arises not from the use of commonplaces in itself, but rather from the ways in which they are employed and combined.

158. And even if the presence of stylistic commonplaces is in play, does the author alter or customize such commonplaces such that a claim for musical distinctiveness can be successfully argued?

159. In the case of the present comparison between "Let's Get It On" and "Thinking Out Loud," it is clear that certain aspects of the backing pattern described above can be thought of in terms of stylistic commonplaces.

160. A chord succession that simply moves through the I, iii, IV, and V chords cannot really be considered original, since there are other songs that employ this pattern.

161. Likewise, bass lines that employ the 1 – 3 – 4 – 5 scale-degree pattern occur commonly enough, though perhaps this scale-degree pattern occurs more often in melodies and less often in bass lines; and the harmonic rhythm common between these two songs occurs in other songs as well.[17]

162. When one considers the combination of these three elements as described herein, the backing pattern that occurs first in the Gaye-Townsend work and subsequently in the Sheeran-Wadge work rises clearly and decidedly above any classification of stylistic commonplace.

163. While this backing pattern may employ individual elements that can be found elsewhere, it is the distinctive combination of these elements that forms the basis for a claim of originality.

164. Taken together, the chord progression, bass line, and distinctive harmonic rhythm

---

[17] A similar instance can be found in jazz during the 1940s and beyond. According to Ted Gioia, "Frequently bebop composers simply grafted an exotic name and a new (usually more complex) melody onto the chords of earlier popular standards. Hence, 'Anthropology' borrowed the harmonies of 'I Got Rhythm,' and 'Ornithology' was a similar reworking of 'How High the Moon.'" See his *The History of Modern Jazz* (New York: Oxford University Press, 1997), pp. 201-202. These bebop reworkings, however, were never hits; and it seems likely that if they had ever been commercially successful, the original songwriters would have sought compensation.

of "Let's Get It On" form a single backing pattern that makes Sheeran and Wadge's specific use of it in "Thinking Out Loud" unmistakable.

165.    The presence of this backing pattern throughout both songs—the way that it functions and the role it plays in each work's formal design—further reinforces the similarity between the two songs: the backing pattern does not simply occur in both songs, it also functions in the same way in both.

166.    If this backing pattern were indeed a stylistic commonplace, we would hear this as a *stylistic* reference.

167.    But in this case, we hear Sheeran and Wadge's use of this pattern as a specific reference to a particular song—Gaye and Townsend's "Let's Get It On."

168.    The specific reference created by the use of the same backing pattern makes the melodic similarities between the two songs in the vocal part seem even more pronounced.

169.    It is possible that, taken in isolation, one might view these melodic similarities as a mere coincidence, arising from the limitation of the musical materials available within the pop style.

170.    But in light of the other marked musical parallels discussed here, the sense that these melodic passages in "Thinking Out Loud" create an additional set of references to "Let's Get It On" is vastly increased.

171.    In the fullest musical and music-analytical context, it seems almost impossible—or at least impossibly unlikely—that these similarities arose by simply by chance.

172.    The backing pattern made up of the combination of a shared chord progression, shared bass line, and shared harmonic rhythm confirm that the Sheeran-Wadge work "Thinking Out Loud" appropriates distinctive material from Gaye and Townsend's "Let's Get It On."

173.     As discussed above, although the bass line is not notated in the sheet music submitted as a deposit copy – because it is written in "lead sheet" format – the bass line is clearly indicated to any experienced reader of music.

174.     Any of these elements taken in isolation might not be enough to trigger a sense of musical déjà vu.

175.     The combination of the three elements affirms the strong and unmistakable similarity between the two songs.

176.     In this case, the combination of these three elements is indeed distinctive enough to be considered a key element in the Gaye-Townsend work.

177.     The status of the backing pattern is indeed accompanimental, but popular music scholars have discussed the ways in which instrumental parts can become important "hooks" in songs—elements that are central to a song's distinctiveness and identity.[18]

178.     The presence of strong parallels in the melodies of these two songs, combined with the similar tempos employed, make the indebtedness of Sheeran and Wadge's work to "Let's Get It On" even stronger.

179.     The three combined elements that combine to produce the backing pattern form a distinctive and important musical dimension in both songs.

180.     The harmonic rhythm-chord progression-bass line combination that makes up the backing pattern in the Gaye-Townsend work is very distinctive and constitutes a signature element of "Let's Get It On": it repeats many times throughout the song, contributing to the

---

[18] Walter Everett finds such instrumental hooks common enough in popular music to warrant a special term; he calls them "tattoos." See his *The Foundations of Rock: From Blue Suede Shoes to Suite: Judy Blue Eyes* (New York: Oxford University Press, 2009).  A few well-known examples would be the opening guitars licks in The Beatles' "Day Tripper," The Rolling Stones' "(I Can't Get No) Satisfaction" and The Byrds' "Mr Tambourine Man," as well as the keyboard intro in the Doors' "Light My Fire."

groove of the recorded version of the song, establishing a sensual feel for the tune, and playing a key role in creating the special identity of "Let's Get It On."

181.    Sheeran and Wadge's parallel use of this same harmonic rhythm/chord progression/bass line combination in the backing pattern for their work, most likely done intentionally, is striking and strongly evokes the Gaye-Townsend work to anybody who knows the 1973 composition or performances of it.[19]

182.    In Sheeran and Wadge's work, the three-element combination is used in much the same way as in "Let's Get It On," as it is repeated throughout the song to create feel and atmosphere.

183.    Thus the use of the backing pattern is not only extremely similar in terms of its structure, but also extremely similar in terms of its function.

184.    It is the distinctive combination of harmonic rhythm, chord progression, and bass line, combined parallels in the melody, similar function of the backing pattern within the song, and in the recording, almost identical tempos, that makes the similarity between Gaye and Townsend's "Let's Get It On" and Sheeran and Wadge's "Thinking Out Loud" clear and unmistakable.[20]

---

[19] This kind of overt reference to another piece of music has called "musical borrowing" by scholars. Musical borrowing has a rich history in music, going back centuries. For a resource that provides a sense of the proportions of this borrowing of the centuries, visit the website, *Musical Borrowing: An Annotated Bibliography*, J. Peter Burkholder, ed. at http://chmtl.ucs.indiana.edu/borrowing/

[20] This study has not devoted much attention to the lyrics in these two songs, and this is because, while both address the longing for a lover from whom the singer is in some way separated, no direct references can be identified that rival those found in the music itself. But since it is typical for references to other, prior works to create an additional layer of meaning in songs or other pieces of music, the question arises whether or not such a reference to Gaye and Townsend's lyrics could be occurring in "Thinking Out Loud"—in other words, does this song's reference to "Let's Get It On" create what scholars would call an "intertextual reference"? It might be posited—though entirely in a subjective manner—that the protagonist in Sheeran and Wadge's song is actually hearing "Let's Get It On" while he is "thinking out loud" about the object of his affection. Perhaps hearing the song on the radio or in a pub triggers memories of their time together, and Gaye and Townsend's song of sexual and romantic longing resonates and inspires the singer.  Maybe it was "their song."  The listener hears "Let's Get It On" in the backing pattern as Sheeran expresses his longing in the melody above it.  In this way, both songs are present at the same time. Such a subjective reading should not form the sole basis for any legal ruling, but it does at least create a context in which

185.    Any argument positing that the Gaye-Townsend work makes use of one or more prior works would need to address the distinctive combination of chord progression, harmonic rhythm, and bass line (backing pattern) as described and detailed above.

186.    It is likely that prior works could be identified that use all three of these elements individually, and perhaps even two of them together.

187.    This report argues that this distinct combination of three specific elements is original to "Let's Get It On" and is not derived from a prior work.

188.    Add to this the melody the song, which in combination with the distinctiveness and structural function of the backing pattern make "Let's Get It On" an instantly recognizable and original work that has become one of the classic songs in the history of American popular music.

## COMPARISON OF THE TWO SONGS: ANALYSIS OF PROFESSOR WALTER EVERETT

189.    Plaintiff adopts as its allegations of fact the analysis set forth in the attached report of Professor Walter Everett, attached hereto and incorporated herein as **Exhibit B**, and detailed in the following paragraphs.

190.    There are a number of factors that—in their presence—give a work of music such as a song its stylistic ties to prior art, or that—in their absence—help make each work novel, unique on its own merits

191.    Different combinations of such factors can reveal stylistic class membership, and

---

Sheeran and Wadge's use of Gaye and Towsend's music can be imagined to be not only intentional, but also poetic and artful. For a study of intertextuality in classical music, see Michael L. Klein, *Intertextuality in Western Art Music* (Bloomington and Indianapolis: Indiana University Press, 2005).

in particularly strong mergings can identify acts of plagiarism.

192.    Sometimes, single factors can be recognized as being identical in two different works, when other factors are different enough to mark the songs as stylistically disparate. In judging the dependencies between two or more songs, one must consider the combinations of factors at play and the degrees of their similarity or difference, measured against the commonness or rarity of these factors in the general population (particularly in the population of typical sources, being pop music produced before 1980).

193.    Such factors include primarily—but are not limited to—chord progression as related to the home key; melodic pitch structure and surface ornamentation; formal relationships of verses, choruses, and other sections; tempo and rhythms (at both structural and ornamental surface levels); and correspondence of lyrics and music.

194.    Dr. Covach has compared Ed Sheeran's "Thinking Out Loud" with Marvin Gaye - Edward Townsend's prior "Let's Get It On."

195.    For purposes of this comparison, he has used the original lead sheet submitted to the United States Copyright Office in connection with the musical composition "Let's Get It On" and the commercially released album recording of "Thinking Out Loud."

196.    Ed Sheeran's "Thinking Out Loud" possesses a combination of so many unusual and sometimes rare factors in common with Marvin Gaye - Edward Townsend's prior "Let's Get It On," in both specific type and degree of dependency, that its borrowing rises to the level of plagiarism.

197.    As will be seen, the case is strong considering a visual interpretation of the Gaye - Townsend deposit copy alone, but the connections between the Gaye and Sheeran songs become inescapable when considering the respective recordings as performances of that lead sheet.

**Chord Progression**

198.    Chord progressions may be characterized in two different ways: by their root names (A, B, C, D, E, F, or G; any of which may be inflected by sharps or flats) and chord quality (major, minor, diminished or augmented; any of which three-note triads may be supplemented by ten various qualities of additional sevenths, ninths, elevenths or thirteenths); thus, there are 924 different chords (7x3x4x11) as identified by root and quality.

199.    Whereas some pairings of chords are far more common than others, there are theoretically 853,776 different ways in which two adjacent chords may relate to each other simply by their root and quality, and more than 728 billion combinations of four chords so related.

200.    The second way chords can be associated includes all of the above, but adds to these connections the functional relationship of each root to the home key.

201.    These relationships are identified by Roman Numeral: the I chord is the major triad whose root is the first degree of the home key's scale; the i chord is the minor triad built on that first degree; the ii° chord is the diminished triad built on the second degree, and so on.

202.    It is by understanding the affiliations of chords with their home key that the listener's musical "ear" determines functional harmonic identity carried across the transposition of a song from one key to another.

203.    Another core consideration in harmonic identity is determined by which particular scale degree appears in the bass, the lowest "voice."

204.    Some scale degrees are inherently so strongly determinative, that their appearance in the bass almost nullifies the value of the collection of pitches appearing above them in determining harmonic function.

42

205.     As illustration, if a bassist plays what would be recognized as the fifth scale degree (^5) dropping to the first scale degree (^1), nearly any pitches may appear above them, so strong are these two harmonic functions when expressed in the bass.

206.     Conversely, if the sixth scale degree (a pitch more weakly tied to the home key's tonal goals than either ^1 or ^5) appears in the bass, its harmonic value is more contingent on upper "voices" to determine the identity and potential usages of that chord.

207.     The essential functional identities of the I$^6$ chord and the iii chord are indistinguishable.

208.     Both triads appear over ^3 in the bass; both also include both ^3 and ^5 in common among upper voices.

209.     The only difference in their identity is the inclusion of ^1 (= ^8) in the I$^6$ chord, as opposed to ^7 in the iii chord.

210.     Particularly among texturally less significant inner voices, these two pitches just a half step apart (^8 and ^7) sound interchangeable, registering only differences of color between them. (^8 and ^1 are exactly the same scale degree, given that the scale replicates in octaves.

211.     This analysis refers to ^1 as ^8 when recognized in connection to its neighbor, ^7)

212.     Often, any difference between the two chords I$^6$ and iii is unrecognizable, especially if ^3 is present in both outer voices, the lead vocal as well as the bass.

213.     Take for instance, the song "The Weight" as performed by The Band. In the verse, the chords progress I - I$^6$ (the second chord appearing with the word "Nazareth"), but the listener can easily convince themselves that what might be a I$^6$ chord is actually iii (the root of

43

which, ^3, is present not only in the bass but also in the lead vocal).

214.    Due to natural acoustics, which create a faint ^7 above a bass ^3 even when it is not performed, this listener is likely not sure whether ^8 or ^7, or both, are present among inner voices. Instead, the listener concentrates on the structural outer voices, both of which move from ^1 to ^3 at "Nazareth," when I moves to $I^6$ (or to iii?).

215.    As a related example, in the Commodores' "Easy," the bass moves from ^1 to ^3 as the lead vocal retains ^3 in moving from I to the song's second chord, giving the resulting $I^6$ a strong equivalence with a listener's posited iii.

216.    Another perspective will add weight to what might be for some an anti-intuitive argument, that the minor iii chord could be equivalent to a major $I^6$ triad.

217.    This relates to the interchangeability of the two triads, based largely on the fact that scale degrees ^3 and ^5 are common to both. In Creedence Clearwater Revival's "Who'll Stop the Rain," for instance, the second phrase of the opening verse, at 0:19 (at the words "clouds of mystery **pourin'**"), the vocal ^3 - ^5 - ^5- ^5 - **^5 - ^3** is accompanied entirely by the I chord. At the corresponding point of the second and third verses, however (at "caught up in the **fable**" and then at "crowd had rushed to-**gether**"), the iii chord substitutes for I (because an inner-voice acoustic guitar moves from ^8 to ^7).

218.    Thus, iii is here equivalent to the I which it replaces (because of ^5 and ^3, common between them, emphasized in the vocal, and because the tiny difference between ^8 and ^7 is buried in an inner voice), but iii is even closer to $I^6$ than to I.

219.    There are a very large number of chord progressions in popular music that consist

of four chords, but for practical purposes far fewer than the billions posited above. In order of decreasing frequency of appearance, based on a study of more than 6,000 tonal songs of the 1950s through the 1970s, the most common major-key progressions opening with I are:

    a.   I - vi - IV - V  (or its bass-line equivalent, I - vi - ii$^6$ - V)

    b.   I - vi - ii - V  (or its bass-line equivalents, I - vi - II - V, or I - IV$^6$ - ii - V)

    c.   I - ii - V - I  (or its bass-line equivalent, I - II - V - I)

    d.   I - IV - V - I  (or its bass-line equivalent, I ii$^6$ - V - I)

    e.   I - iii - IV - I  (or its bass-line equivalent, I - I$^6$ - IV - I)

    f.   I - iii - IV - V  (or its bass-line equivalent, I - I$^6$ - IV - V)

    g.   I - II - IV – I

    h.   I - IV - V – IV

    i.   I - vi - IV - I

220.    The term "progression class" denotes groupings of progressions that share the same function.

221.    Thus, the "I - iii - IV - V progression class" will also include its equivalents such as I - I$^6$ - IV - V. (Another member of this class might be the common I - $\flat$III - IV - V, but this chromatic form will not be discussed here.)

222.    Many other commonly heard four-chord progressions (such as VI - II - V - I or vi - IV - I - V) open with non-I functions; perhaps most ubiquitous are those satirized by the Axis of Awesome in "Four Chords."

223.    Among the progression classes beginning with I listed above, however, **the progression class shared between the works by Marvin Gaye - Edward Townsend and Ed Sheeran, I - iii - IV - V, is uncommon, with far fewer examples than any of those progressions listed above it.**

224.    Looking at the lead sheet "deposit copy" of "Let's Get It On," one finds the chord indication "Gm" 34 times.

225.    This is the iii chord, spelled G - Bb - D from the bass up in the key of Eb major. Conversely, the "Eb/G" chord, the I6 chord (spelled G - Bb - Eb from the bass up) is not indicated anywhere, and yet the bass line called for by the chord indications above the staff is identical in all cases and as shown in Example 1, the singer is to sing emphatic Ebs (circled) rather than D, rendering the "gm" chord (arrow) in actuality a I6 chord, Eb6.

**EXAMPLE 1:**



226.    In fact, D is a seldom-used pitch in the Gaye - Townsend composition; of the 470 vocal pitches notated in the "deposit copy," there are only eight vocal Ds.

227.    In fourteen of the 34 "Gm" chords, there is an Eb present instead of a D, rendering them all true I6 (Eb/G) chords from any perspective.

228.    **Thus, it is clear from the Gaye - Townsend written notation that the "iii"**

chord, Gm, can be performed interchangeably with the "I6" chord, Eb/G, as long as ^3 is played in the bass. Therefore, Sheeran's band (which performs I6 chords more often than iii chords) performs identical chord progressions to those notated in the Gaye - Townsend deposit copy.

229.    This factor alone does not mark the songs as an example of plagiarism, but is a strong basis for showing them to be based on the same musical structure.

230.    One must examine the progression's melodic voicing, its formal role, and its setting in terms of rhythm and tempo, among other factors that the two songs share or do not share with each other and with the general population of song sources.

**Melodic Voicing: Structure and Surface Ornamentation**

231.    Voicing is primarily determined by which chord tones are present in the <u>outer voices</u>, and to a lesser degree in the <u>inner voices</u>.

232.    In pop music, the outer voices are articulated by the singer (upper voice) and the bass player (lowest "voice").

233.    Chord tones are identified as root, third or fifth (the constituents of each triad); and possible additions of non-triadic seventh, ninth, eleventh, or thirteenth, and their relationships to the three triad constituents.

234.    As suggested in above, triads may be performed with a large number of different possible upper-voice melodic components: The I chord may support vocal scale degrees ^1, ^3, or ^5 as its root, third or fifth.

235.    The ii chord may support ^2, ^4 or ^6 in the same way; and iii, ^3, ^5 or ^7. These triadic tones may appear in any combination, repeated or not, and may be ornamented by non-chord tones.

236.    For instance, the root of the I chord, ^1, may participate in a singer's upper-voice melodic line that moves ^3 - ^2 - ^1 over the I chord, the vocal part thereby passing from the triad's third (^3) to its root (^1) through a non-chord tone (^2).

237.    Similarly, the iii chord may support an upper-voice line that features a neighboring motion ornamenting the triad's third: ^5 - ^6 - ^5.

238.    There are an infinite number of ways a single triad may support its upper voice, some arrangements more stable with an emphasis on chord tones, and some more active by their emphasis on non-chord tones.

239.    In comparing the melodic vocal pitches for the first two phrases of each of (a) Marvin Gaye - Edward Townsend and (b) Ed Sheeran works, shown below, note that each example is based on the same repeated chord progression, supporting variations in the vocal parts.

240.    For each song, chords are indicated with bold roman numerals, and melodic pitches with regular arabic numerals.

241.    Vertical bar lines locate the accented beginnings of measures, each of which contains four beats; semicolons divide the phrases.

242.    Although the verse of each song is built upon four hearings of the same progression, the first two phrases (essentially repeated, with ornamental variation, for phrases three and four) are sufficient for comparison purposes.

    a.    Marvin Gaye - Edward Townsend, "Let's Get It On," first two phrases of verse: **I - iii** 3 | -4-5-4-b3-2 | **IV** b3-2-1- | **V** 1- | 1-2; **I - iii** b3-2- | b3-2 - | **IV** 1-6 | **V** b3- | -2-1.

    b.    Ed Sheeran, "Thinking Out Loud," first two phrases of verse: **I - I⁶** 3 | -4-5-4-

48

3-2-1- | **IV** 2-3-6-1 | **V**; | **I - I**⁶ 3- | 4-5-4-3-2-1- 1 | **IV -** | **V**

243.    For clarity, the above relationships are shown in the following excerpt, Example

2, taken from the deposit copy of "Let's Get It On," notated with scale-degree numbers placed

above the staff and tablature:

**EXAMPLE 2:**



244.    Holding aside rhythmic similarities for the moment, the two melodies exhibit

many identical elements with pitch alone, all accented in relation to their ornamental differences:

a.   Both melodies begin on chord tone ^3, ascend stepwise through non-chord

tone ^4, and reach up to chord tone ^5 before falling stepwise. The onsets of

both vocal melodies are delayed until the second chord, iii (Gm), appears. In

both cases, ^5 appears midway through the first full measure of the phrase.

**b.   Both melodies descend stepwise from ^5 to ^1:** The Gaye - Townsend

composition directs the performer to luxuriate in the descent, ornamenting ^3

with a ^b3 blues inflection (which appears as a dissonant seventh over the IV

chord); Sheeran descends more quickly to ^1 before IV appears, but then

moves to ^3 as the dissonant seventh over the IV chord.

c.   In the second phrase's recurring IV chord (Ab), Gaye - Townsend moves from

49

^2 to chord tones ^1 - ^6. In his first phrase's IV chord, Sheeran accents non-chord tone ^2, then moves to chord tones ^6 - ^1.

d. Perhaps most tellingly, both melodies end with an ornamented ^1 in the vocal despite the fact that all phrases end on V (which is normally most characteristic in <u>withholding</u> ^1), making for the same tension-filled, non-resolving non-chord tones in the phrases' climaxes.

245. Regarding the differences noted in just above, one might argue that in general, melodies may be marked if they feature chromatic adjustments to pitches: ^b3, for instance, or ^#4 or ^b7.

246. In the works, clearly shown in the deposit copy, Gaye - Townsend often ornaments ^3 by directing one to sing ^b3 instead, as when the composition directs the performer to luxuriate on the initial descent, ornamenting ^b3 with lower neighbor ^2.

247. Sheeran, on the other hand, never performs ^b3.

248. The difference is a stylistic one, and not related to the song's fundamental pitch structure.

249. When Pat Boone would perform Little Richard's songs, his covers became "whitebread" performances by omitting Richard's blues-based flatted tones.

250. In the same way, Sheeran is making an autotuned pop cover out of Gaye - Townsend's R&B model, rather than recomposing it.

251. For their part, Gaye and Townsend rarely have flatted tones in verses appearing after the first.

50

252.    In fact, the last statements of the Gaye - Townsend verse phrases appearing just before the fade, shown below in Example 3, contain no flatted notes but still conform to the ^3-rising to-^5, then falling to-^1 structure, anticipating Sheeran's performance:

**EXAMPLE 3:**



253.    The Gaye - Townsend composition frequently ornaments ^5 in an upper voice with its non-chord tone upper neighbor ^6, as in this excerpt, Example 4:

**EXAMPLE 4:**





254.    In each of these 6-5 combinations, ^6 (C) is a neighbor to ^5 (Bb), because ^5 is the chord tone (a member of both Eb and Bb7 chords), whereas C comes from outside the chord. Sheeran frequently ornaments ^5 with its non-chord tone upper neighbor ^6 in an obtrusive guitar part, as at 0:13 - 0:14, where this ornament expresses the upper voice by virtue of the vocal rest.

255.    **Thus, both songs use the same pitch relationship in the same voice for the same ornamental function relating the same scale degree to the same non-chord tone.**

256.    The Gaye - Townsend composition's upper-voice emphasis on ^5 and ^3 shown throughout the deposit copy is unusual when supported by the iii chord, which is more characteristic with ^7 in the upper voice.

257.    This ^7 is more typically part of a descending line, such as ^8 - ^7 - ^6 - ^5, each pitch sustaining (with possible ornamentation) over one chord within the I - iii - IV - V progression.

258.    Examples of this combined upper voice and chord progression are ubiquitous and appear in all of the following, each released before "Let's Get It On":

      a.  Pat Boone, "Gee, But It's Lonely"

      b.  Larry Hall, "Sandy"

      c.  Cathy Jean & the Playmates, "Please Love Me Forever"

      d.  Jay & the Americans, "Cara Mia"

      e.  Dickey Lee, "Patches"

      f.  The New Christy Minstrels, "Green, Green"

      g.  Peter, Paul & Mary, "Puff (The Magic Dragon)"

      h.  Jimmy Clanton, "Venus in Blue Jeans"

    i.   Gerry & the Pacemakers, "Ferry Across the Mersey"

    j.   Diane Renay, "Navy Blue"

    k.   Ed Ames, "My Cup Runneth Over"

    l.   Donovan, "Hurdy Gurdy Man"

259.    Closely related is the upper-voice ^8 - ^7 - ^6 - ^7, as heard in the introduction to the Seekers' "Georgy Girl." We also sometimes hear ^8 - ^7 - ^8 - ^7, as in Tony Orlando's "Bless You."

260.    **Because neither the Gaye - Townsend composition nor Sheeran in his performance are interested in the upper-voice ^7, the melodies in the Gaye - Townsend deposit copy and the Sheeran recording are marked as deviant from the most common vocalization against iii in this specific progression, further supporting the connection of class members I - iii - IV - V and I - I$^6$ - IV - V in these works.**

**Formal Relationships**

261.    Songs with verse-chorus structure alternate verses featuring different sets of lyrics against choruses, which essentially repeat their lyrics.

262.    Many songs include other sections such as bridges, introductions, refrains, pre-choruses, instrumental breaks, codas and fade-outs, plus smaller-scale variations that add, subtract, extend or curtail phrases within any of these parts. Additionally, sections such as verses themselves may constitute couplets, twelve-bar forms, bar forms, SRDC forms, or other patterns.

263.    Both Gaye - Townsend and Sheeran present us with verse-chorus examples that include contrasting sections (referred to here as bridges) as well.

264.    In both songs, verses are composed of couplets formed of a repeated line.

265.    One line of each couplet is shown above; in both songs, the repeated line itself

contains a repeated progression (in the Gaye - Townsend model, the repeated progression is Eb - Gm - Ab - Bb7).

266.    Each verse, then, in both songs, contains one progression heard four times, supporting a longer line performed twice.

267.    In both songs, the chorus (bars 17-32 in Gaye - Townsend, shown below in Example 5, and 1:20-1:50 in Sheeran) is also in the identical pattern, lines heard over four performances of the I - iii - IV - V progression class (four times through the progression, Eb - Gm - Ab - Bb7, numbered parenthetically in Ex. 5); in Sheeran, a short double-time two-bar suffix extends the last repetition.

**EXAMPLE 5**





268.    Thus, both songs share the same formal structure at sub-phrase (4-bar progression), phrase (8 bars, repetition of progression), section (16 bars of two phrases), and multi-section levels (verse, chorus, bridge), and in each case, identical harmonic materials fill the structures.

269.    In relation to other parts of songs, the I - iii - IV - V progression class may appear as part of any number of functions within the formal structure:

The I - iii - IV - V progression . . .

      a.  . . . . may be repeated once to constitute the entire verse, to then be followed by a bridge, as in Peter & Gordon's "I Go to Pieces."

      b.  . . . . may be heard four times, constituting the entire verse, to be followed by a bridge, as in the Stone Poneys' "Different Drum."

      c.  . . . . may be repeated to open the verse, then lead to a single concluding phrase for a bar form, as in the Beach Boys' "I Can Hear Music."

      d.  . . . . may be repeated to open the verse, and then move to a contrasting two-phrase refrain, as in the Turtles' "You Baby," the Seekers' "Georgy Girl," or Donovan's "Hurdy Gurdy Man"

      e.  . . . . may open both the antecedent and consequent phrases of a period, each time followed by a contrasting passage that leads to cadence, as in Peter, Paul & Mary's "Puff (The Magic Dragon)" or the Toys' "A Lover's Concerto."

    f.  . . . . may be <u>repeated</u> within <u>both</u> the antecedent and consequent of a period (without contrasting passages), as in Bob Dylan's "Sad-Eyed Lady of the Lowlands."

    g.  . . . . may function as a varied repetition, such as when I - iii - IV - I is followed by I - iii - IV - V, as in the Cyrkle's "Red Rubber Ball."

    h.  . . . . may appear as a contrasting idea, such as in the D-gesture of an SRDC structure, as in Dickey Lee's "Patches" and "Laurie (Strange Things Happen)."

    i.  . . . . may appear as the basic idea of a sentence structure, as in Oliver's "Jean."

    j.  . . . . may appear as one of four different progressions within a single verse, as in Ed Ames' "My Cup Runneth Over."

    k.  . . . . may be repeated in a one-part, strophic form, as in the Four Seasons' "Opus 17 (Don't You Worry 'Bout Me)."

    l.  . . . . may be withheld until the chorus, as in Jay & the Americans' "Walkin' in the Rain."

    m.  . . . . may be withheld until the bridge, as in the Beatles' "I Feel Fine."

270.    Most four-chord loops (repetitions of the four-chord pattern) do not contain the iii chord; witness I - VI - II - V, the basis of the ubiquitous "Rhythm" changes, as in the Beatles' "Rocky Raccoon" (see above).

271.    When the iii (III) function is repeated multiple times as a continuous loop, it is nearly always given a bluesy flatting, as in the I - ♭III - IV - IV♭ of the Yardbirds' "For Your Love" or the I - ♭III - IV - ♭VI of the Monkees' "(I'm Not Your) Steppin' Stone."

272.     See also, for instance, the I - IV - V - IV loops of the Kingsmen's "Louie Louie" or the McCoys' "Hang on Sloopy."

273.     **It is very unusual to repeat the I - iii - IV - V progression as a loop without contrast, and beyond rare to do so throughout the entirety of both verses and choruses; the Commodores' "Easy" is the only such example known to me other thanthe Gaye - Townsend and Sheeran works.**

**Rhythm including Syncopation**

274.     Syncopation, which is the accentuation of a beat that occupies a normally weak metric position (such as the backbeat or offbeat), is also a telltale marker that unitesthe Gaye - Townsend and Sheeran works in unusual ways. In songs that include the I - iii - IV - V progression class, chords typically change every four beats (a full bar), providing a "harmonic accent" on strong downbeats (the first beat of every bar). Syncopated chord changes, occurring on weak beats, are much less common, but these are heard in both Gaye - Townsend and Sheeran works.

275.     The following excerpt, Example 6, numbers every beat below each staff. Beats 1 and 3 are always metrically strong in relation to beats 2 and 4 (the backbeats).

276.     Accenting weak beats by playing on the backbeat creates syncopation.

277.     In the deposit copy, convention would have all chord changes notated on the strong first beat of every bar, but note that in Example 6, each Gm chord and Bb7 chord occurs early, on the weak fourth beat of the previous bar.

278.     This creates a very characteristic syncopation. Note that not only are the chord changes syncopated, but so is the vocal line; see how for nearly all syncopated Gm and Bb7 chords, the voice articulates a syllable on a weak beat and ties or slurs it across a barline (see

57

"I've," "baby," and "so").

**EXAMPLE 6:**



279.    A search of a sample of 6,000 songs (all top-twenty hits plus hundreds of album tracks) from 1955 to 1975 reveals only a small handful that contain examples of syncopated changes within the I - iii - IV - V progression class. All are listed here.

a.   The Seekers' "Georgy Girl" has the following harmonic rhythm: I (on downbeat) - iii (on the <u>weak</u> fourth beat) - IV (on the following downbeat) - V (on the <u>weak</u> fourth beat).

b.   The Grass Roots' "Sooner or Later": each chord change appears on the anticipatory <u>weak</u> half of a <u>weak</u> fourth beat.

c.   Marvin Gaye's "Let's Get It On": I (on downbeat) - iii (on the <u>weak</u> fourth beat) - IV (on the following downbeat) - V (on the <u>weak</u> fourth beat).

d.   Ed Sheeran's "Thinking Out Loud": I (on downbeat) - iii (on the <u>weak</u> fourth beat) - IV (on the following downbeat) - V (on the <u>fourth</u> beat).

e.   Two well-known examples of a similarly syncopated four-chord progression (accenting first a downbeat, then the anticipatory <u>weak</u> half of a <u>weak</u> fourth beat, then this pattern repeated), Wilson Pickett's "In the Midnight Hour" and Eddie Floyd's "Knock on Wood," are based on a different four-chord

58

progression: the minor-pentatonic ♭VII5 - V5 - IV5 - ♭III5 - I5 in the former

and I5 - ♭III5 - IV5 - V5 - ♭VII5 in the latter. (Steve Cropper is said to have

had the idea of inverting the former's progression for the latter recording.)

280.    Thus, the Gaye - Townsend and Sheeran works are two of only three songs in a

6,000-song sample using the I - iii - IV - V chord progression class that share the same pattern of

syncopated chord changes (the third being "Georgy Girl").

281.    Melodies are marked by which vocal pitches are metrically accented in relation to

others, which appear directly with the chord changes (the strongest accent, especially when

aligning with first beats of measures) and which appear in weaker metric locations.

282.    As shown in the examples given above, **both Gaye - Townsend's and Sheeran's

vocal melodies begin in metrically weak positions, delaying the singing of the lyrics until

the second chord appears. Also in both cases, ^5 appears midway through the second bar

of the phrase.** (This can be seen in Example 6 directly above.)

283.    Whereas in most songs, verses maintain the same or similar rhythms one after the

other, both Gaye - Townsend and Sheeran provide a great deal of extemporaneous rhythmic

abandon in verses that appear after the first, especially ending phrases in different places (on beat

3, on the second half of beat 3, on beat 2, etc.), thus **both the Gaye - Townsend composition

and Sheeran expressing the same degree of rhythmic freedom on the musical surface.**

284.    Illustrations of the rhythmic variation can be found in the last syllables of each

unique phrase shown in the examples quoted above:

a.  Ex. 2: "baby" is articulated on beat 4; "long" is articulated on beat 2

b.  Ex. 3: "baby" is articulated on the second half of beat 2; "sanctified" is

articulated on beat 3

c.  Ex. 5: "Ow" is articulated on beat 2; "baby" is articulated on beat 2 then on

beat 1; "sugar" is articulated on the second half of beat 4; "Ooh" is articulated

on beat 2

**Correspondence of Lyrics and Music**

285.    Both Gaye - Townsend and Sheeran works are expressions of a single theme: both

are romantic songs, in each a man gently asking a woman for physical lovemaking, and both

betraying an inner tension with numerous sorts of struggles. Gaye - Townsend expresses this as

sexual tension: "I've been really tryin', baby, tryin' to hold back this feelin' for so long,"

whereas Sheeran displaces the tension: "when your legs don't work like they used to before."

286.    While this is a common theme, and the lyrics of the two songs do not intersect in

particulars, the two musical settings are identical in ways that support the same theme and their

respective lyrics.

287.    The chord loop in each song, because it ends in a tension-filled V chord that does

not resolve to I within the phrase, constantly sets up expectations in Gaye - Townsend of release

that never comes, and only occurs in Sheeran in his two-bar suffix to the chorus (an extension

mentioned above).

288.    **More singular is the fact that in both songs, phrases that conclude on V never**

**harmonize the upper-voice ^1 with which each vocal phrase ends, the ^1 never moving to**

**members of the V chord such as ^2 or ^7, but instead being left unresolved.**

289.    The perfect illustration in seen in Example 5, bar 24, where "Let's get it" is sung

on a repeated non-resolving ^1 while the V7 chord (Bb7) is sustained; exactly the same

dissonant expression appears at "for so long" in Example 6.

290.    Most rock and pop singing is syllabic, one pitch sung for each syllable. Gaye and

Townsend often direct the singer to perform melismatically to express a soulful purgation, the

free release of inner tension, with multiple pitches sung per syllable.

291.    Sheeran performs "Thinking Out Loud" the same way. Extended melismas occur

numerous places in the Gaye - Townsend composition, such as in:

      a.    Ex. 1: "try-" sung on six pitches, repeating gb - f (^b3 - ^4) multiple times

      b.    Ex. 3: "On" sung on two long pitches, c - bb (^6 - ^5), then "On" on four

            pitches, bb - c - bb - g (^5 - ^6 - ^5 - ^3)

292.    Gaye - Townsend's most expressive melisma is notated over the tense

retransitional V at the end of the second bridge. As shown in Example 7, below, the syllable

"bush" requires eight pitches, g - ab - g - ab - g - f - g - f (^3 - ^4 - ^3 - ^4 - ^3 - ^2 - ^3 - ^2), two

of them extended with syncopations crossing barlines:\

**EXAMPLE 7:**



293.    In Sheeran, such extended melismas are performed at 1:21, 2:04, 2:48, 3:58, and

4:33, **for a similar distribution in number as appearing in Gaye - Townsend**.

294.    In summary, comparison of the Gaye - Townsend deposit copy with the Sheeran

recording yields a number of correspondences: both songs share the same repeated four-chord

progression.

295.    Both feature melodies based on the same distinctive structural shape, including similar relations between vocal tones and underlying chords, and both display the same rhythmic freedom.

296.    Both songs share the same formal structures at all levels, from surface phrases to largest sections.

297.    Both are among the only three known songs to share the same syncopation of the repeated four-chord pattern.

298.    The sharing of all of these elements strongly evidence copying by Sheeran of Gaye - Townsend.

299.    In addition to the factors enumerated above, a comparison of Ed Sheeran's recording with Marvin Gaye's 1973 hit recording shows additional commonalities not revealed when considering the lead-sheet deposit copy alone.

**Chord Progression**

300.    As discussed above, the Gaye - Townsend and Sheeran works share a progression class, I - iii - IV - V, an uncommon one among those progressions opening with I.

301.    Through most of "Let's Get It On," no ^7 can be heard in any inner voices, rendering its "iii" absolutely identical to I6 (see above), meaning that the two songs share identical harmonic progressions.

302.    In listening to Gaye's recording, one can hear that of the 34 "Gm" chords shown in the deposit copy, fourteen include an Eb instead of D, making them effectively I6 chords instead of the "Gm" indications of iii chords.

303.    In 24 of the 34 chords, there is no D anywhere in the vocal or accompanimental

texture as heard.

304.    In fact, D is a seldom-used pitch in Gaye's performance; of the 451 vocal pitches heard in the recording, there are only five vocal Ds. In fourteen of these resulting "Gm" chords, there is an Eb present instead of a D, rendering them true I6 chords from any perspective.

305.    **Thus, it is clear from a comparison of the Gaye recording and the the Gaye - Townsend deposit copy that the "iii" chord, Gm, can be performed interchangeably with the "I6" chord, Eb/G, as long as ^3 is played in the bass.**

306.    **Therefore, Sheeran's band performs identical chord progressions to those heard in the Gaye recording.**

**Melodic Voicing: Structure and Surface Ornamentation**

307.    One factor not appearing in the deposit copy but clear in the recordings shows how Sheeran modeled his performance on Gaye's recording.

308.    Among other performance values, Gaye often sings in falsetto, forcing his voice above the upper extreme of its high natural range.

309.    The first such appearance is with the interjectory syllable, "whoo!" on a high ^1 at 0:25, contrasting with the following chorus, which begins in Gaye's lowest register; this falsetto "whoo" reappears throughout the hit recording.

310.    Sheeran, who has the same high range, makes frequent use of falsetto, often in word trail-offs (as on "oh" at 3:33-34), but sometimes quite up front, as in the sustained word "same" at 2:54.

**Formal Relationships**

311.    In both songs, bridges lead to retransitional stop-time solo singing over climactic V chords that introduce choruses while nearly all of the pitched accompaniment drops out (2:20-

2:22 in Gaye, 0:56-1:19 in Sheeran).

312.    The Bb7 chord, the only time it is sustained for four full bars in the entire song, is the climactic V chord.

**Tempo and Syncopation**

313.    Tempo is a very strong additional mark of distinction that pairs the two works. Songs with four beats per measure (the same meter as in Gaye and Sheeran) that include the I - iii - IV - V progression-class range from a slow 72 beats per minute (as in Connie Francis's "Where the Boys Are") to a fast 160 bpm (as in Bobby Rydell's "Forget Him").

314.    **Both Gaye and Sheeran recordings proceed at the same, at 80 bpm (± 2 bpm, as they both fluctuate slightly).**

315.    <u>**Not a single other song in a 6,000-song sample that includes a I - iii - IV - V or I - I$^6$ - IV - V progression has the same slow tempo.**</u>

In regard to §D1 in Part I, all other known such examples of syncopated changes within the I - iii - IV - V progression class, listed again here, have a tempo much faster than Gaye's and Sheeran's 80 bpm:

The Seekers' "Georgy Girl": Tempo: 152 bpm.

The Grass Roots' "Sooner or Later": Tempo: 126 bpm

Marvin Gaye's "Let's Get It On": Tempo: 80 bpm

Ed Sheeran's "Thinking Out Loud": Tempo: 80 bpm

Wilson Pickett's "In the Midnight Hour": Tempo: 116 bpm

Eddie Floyd's "Knock on Wood": Tempo: 104 bpm.

316.    Thus, the Gaye and Sheeran works are two of only three songs in a 6,000-song sample using the I - iii - IV - V chord progression class that share the same pattern of syncopated

chord changes (the third being "Georgy Girl"), <u>as well as being the only two such examples with</u> <u>that progression class to move at the tempo of 80 bpm</u>.

**<u>Summary</u>**

317.    To encapsulate the above arguments, focusing on the correspondences between Gaye - Townsend's "Let's Get It On" and Sheeran's "Thinking Out Loud," first addressing elements shared with the deposit copy:

a.   Both songs are based on the same progression class (I - iii - IV - V), indeed mostly on exactly the same progression, $I - I^6 - IV - V$.

b.   Both songs use this progression as a loop in both verse and chorus passages.

c.   Both upper-voice melodies are based on the shape, ^3 - ^4 - ^5 - ^4 - ^3 - ^2 - ^1, which then moves to scale degrees ^6, ^1 and ^2, with identical accents.

d.   Both songs emphasize as scale degrees upper-voice ^5 and ^3 over the iii chord, as opposed to the more usual ^7 over iii.

e.   Both songs end cadential phrases on a non-resolving upper-voice ^1, even though this is not a member of the goal V chord. In both cases, the lack of tension resolution is related to the song's underlying theme.

f.   Both songs share the same formal structure at sub-phrase, phrase, section, and multi-section levels.

g.   Both songs share the same identical syncopated rhythm of chord  changes.

h.   Both songs' vocal melodies begin in the same markedly weak metrical location, and in both, the vocal goal of ^5 is achieved at the same metrical position within the phrase.

i.   Both songs have a similar distribution of vocal melismas, expressing in

both a similar theme.

318.    When one considers the "Let's Get It On" sound recording, additional
commonalities emerge:

   a.   Both songs have the identical tempo of 80 beats per minute (±2 bpm, as
        above), uniquely for the chord progression.

   b.   In both recordings, the repeated chord progression is played in such a way
        to make the "iii" chord absolutely identical to the "I6" chord, bringing the
        two songs even closer together.

   c.   In both recordings, most instrumentalists drop out for a moment of "stop
        time" precisely at the end of the bridge's retransition, enabling the singer
        to prolong the climactic V chord with solo singing.

   d.   Sheeran's recording—notably his strategic use of falsetto voice—is clearly
        modeled after Gaye's recording.

319.    It has been shown above that the combination of two or three of the above
factors occurs only in these two songs. The fact that all factors are held in common proves
the case.

320.    Defendants' access to Plaintiff's work is beyond challenge, as "Let's Get It On" is
a world-famous composition and recording, and the two works are indeed substantially similar
for purposes of copyright infringement.  The additional fact that no other song shares the
foregoing characteristics is strong evidence not of arbitrary convergence or parallel development,
but knowing, willful infringement.

321.    Indeed, upon information and belief Sheeran himself regularly performs both
songs together in a "mash-up" format, moving from one song to the other and back again.  At

least one example of one such performance is publicly-available on YouTube

(https://www.youtube.com/watch?v=RxZjVZKVN7k) (see time index 4:29-5:10).  Sheeran

transitioned seamlessly between the lyrics of the two songs without changing the notes, tempo,

rhythm or any other elements.   The video was uploaded to YouTube on November 20, 2014, the

day after the concert from which it was taken.

322.   **Thus, Sheeran himself had actual notice, and upon information and belief the**

**balance of the Defendants had actual and/or constructive notice, of the similarities between**

**the two musical works no later than November 19, 2014**. As discussed below, the *Spin* article

was published March 11, 2015, and official notice of the infringement came no later than April

15, 2015, when counsel for the *Griffin* plaintiffs gave notice and provided a musicologist report.

323.   Upon reasonable information and belief, "Thinking Out Loud" has hit the number

one (1) position on the national charts in eleven (11) countries since 2014, including both the

United States and the United Kingdom, and has been certified platinum multiple times by the

Recording Industry Association of America, indicating sales in excess of one million (1,000,000)

copies sold in the United States, as well as substantial sales internationally. The single and the

album "X" sold over fifteen (15) million copies. In 2015, "Thinking Out Loud" was a top-three

song as measured by performance income in the world. Revenue derived and/or related to

"Thinking Out Loud," including but not limited to record sales, performance tour income,

merchandising, synchronization and licensing are in the hundreds of millions of dollars.

324.   According to the Official Charts Company, the recording of "Thinking Out Loud"

is one (1) of the best-selling singles of all time in the U.K., having sold over 2 million

(2,000,000) copies and ten (10) million albums. Upon reasonable information and belief, the

Defendants have authorized the use of "Thinking Out Loud" in compilation albums, television

commercials and music videos. Specifically, the music video for "Thinking Out Loud" is one of the most popular sponsored music videos on YouTube.  Prior to the viewing of "Thinking Out Loud" on YouTube, an advertisement appears for which the Defendants are entitled to and receive a royalty or other revenue, which is Plaintiff's money. As of June 2018, "Thinking Out Loud" has been played over **one billion times** on YouTube and streamed **billions** of times.

325.    The Defendant, Mr. Edward Sheeran, has had access to "Let's Get It On" by virtue of its wide dissemination. In fact, he has referenced and performed the song while also performing "Thinking Out Loud".  In addition, the Defendant, Edward Sheeran, by and through the Defendant, Sony/ATV, had increased access to "Let 's Get It On" because both songs are administered globally through Sony/ATV.  Furthermore, "Let's Get It On" is available on every major digital retailer and streaming service including, without limitation, iTunes and Amazon.

326.    The melodic, harmonic, drums, bass line, backing chorus, tempo and syncopation elements of the "Thinking Out Loud" composition are substantially and/or strikingly similar to those elements of the "Let's Get It On" composition.  The instant Defendants copied, reproduced, distributed, and/or publicly performed copyrightable elements of "Let's Get It On" specifically, the melody, harmony, drums, bass line, backing chorus, tempo and syncopation of "Let's Get It On", without authorization. The two works in question are therefore substantially similar.

327.    To date, each of the Defendants reproduced, distributed, publicly performed, and/or authorized the reproduction, distribution, and public performance of the infringing composition and sound recording "Thinking Out Loud" and each of the Defendants continues to infringe "Let's Get It On".

328.    Upon information and belief, the Defendants were notified of the infringement at

least as early as April 15, 2015 (the "Notice"), by the parties to the *Griffin* action, and were provided with a written report from musicologist Dr. Alexander Stewart, setting forth the basis for the infringement.  Despite, upon information and belief, receiving the Notice, the Defendants continued to exploit "Thinking Out Loud" without permission, by using the melodic, harmonic, drums, bass line, backing chorus, tempo and syncopation elements copied from "Let's Get It On" composition, which use constitutes copyright infringement.

329.    Upon further information and belief, Sony/ATV was provided with a copy of the March 11, 2015 *Spin* magazine article, and spoke to counsel for the *Griffin* plaintiffs, within days of the article's publication.

330.    Despite, upon information and belief, the Notice, all of the Defendants have continued to infringe Plaintiff's copyrighted work. The infringement by the Defendants is willful, as evidenced by their continuing to infringe "Let's Get It On" after the Notice, upon information and belief, was provided to them.

331.    On August 9, 2016, Kathryn Townsend Griffin, Helen McDonald, and the Estate of Cherri Gale Townsend, filed a complaint for copyright infringement in the United States District Court for the Southern District of New York, 16-cv-6309, against Sheeran, Ed Sheeran Limited, Gingerbread Man Records, Wadge, Amy Wadge Studios, Gosling, Sticky Studios, Sony/ATV Music Publishing, Ltd. UK, Sony/ATV, Atlantic Records, Atlantic Records (UK), BDi, Bucks, Warner Music Group Corporation and Warner Music Group, Ltd. (UK), alleging that "Thinking Out Loud" infringed the copyright in the musical composition "Let's Get It On." That case was terminated February 15, 2017.

332.    On July 11, 2017, Kathryn Townsend Griffin, Helen McDonald, and the Estate of Cherri Gale Townsend, filed a complaint for copyright infringement in the United States District

Court for the Southern District of New York, 17-cv-5221, against Sheeran, Atlantic Records, Sony/ATV and Warner Music Group Corporation, alleging that "Thinking Out Loud" infringed the copyright in the musical composition "Let's Get It On."  That case is ongoing.

333.    The Defendants knowingly and intentionally infringed Plaintiff's rights.  The Defendants' collective knowledge and intent are established by, among other things, the fact that Defendants to this day have neither sought, nor obtained, a license from the owners of the rights. All conditions precedent to the maintenance and/or establishment of the instant action have been satisfied and/or, otherwise, waived by the Defendants.


**Sony/ATV and Stone Diamond, Along With EMI Music Publishing, Sony/ATV, Sony Music, and Sony Corporation of America, Failed and Refused to Take Action to Enhance and Protect the Copyright in the Composition**

334.    Stone Diamond is the legal owner of the "Let's Get It On" composition, while SAS is one of its beneficial owners.

335.    As a beneficial owner of the "Let's Get It On" composition, SAS may bring infringement actions in the United States such as this one, and file copyright registrations, such as the 2020 registration at issue in this case.

336.    A beneficial owner may not, however, bring infringement actions outside of the United States – only the legal copyright owner and/or publisher such as Stone Diamond,  and/or exclusive administrator, such as Sony/ATV, may do so.

337.    Actions for copyright infringement brought in the United Kingdom against residents of the United Kingdom can adjudicate issues of copyright infringement occurring in any European Union member country.  Defendants know this, and have known this at all relevant times.

338.    Actions for copyright infringement brought in the United Kingdom and the

European Union enjoy a six-year statute of limitations.  Defendants know this, and have known this at all relevant times.

340.    In addition, in actions for copyright infringement brought in the United Kingdom and the European Union, no copyright registration is required as a prerequisite for filing. Defendants know this, and have known this at all relevant times.

340.    In addition, in actions for copyright infringement of musical compositions brought in the United Kingdom for damages arising in the United Kingdom and in any European Union member countries, as well as actions brought in the European Union member countries themselves and in all countries around the world, plaintiffs are not limited to using sheet music to demonstrate to the court that the composition has been infringement.  Indeed, plaintiffs in such cases may use sound recordings to demonstrate infringement of musical compositions without limitation.  Sony/ATV (and to the extent applicable, Stone Diamond, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) had the power – and should have exercised the power – to initiate legal actions around the world to seek damages for copyright infringement of the "Let's Get It On" musical composition by "Thinking Out Loud." Defendants know this, and have known this at all relevant times.

341.    Sony/ATV is the administrator of the "Let's Get It On" composition.  As administrator, Sony/ATV is responsible for administering, registering and licensing the "Let's Get It On" composition, and collecting publishing royalties from such licenses on behalf of Stone Diamond, the legal owner of the composition.

342.    Upon information and belief, the scope of Sony/ATV obligations to the owners of the "Let's Get It On" composition are detailed in one or more contracts between Sony/ATV (or its corporate predecessors or successors/assigns) and the owners of the composition.

343.    Upon information and belief, one or more of EMI Music Publishing, Sony/ATV, Sony Music and Sony Corporation of America own, control or share Stone Diamond's copyright rights in the "Let's Get It On" musical composition.

344.    Upon information and belief, one or more of EMI Music Publishing, Sony Music and Sony Corporation of America own, control or share Sony/ATV's rights and obligations as worldwide administrator of the "Let's Get It On" musical composition.

345.    Upon information and belief, Sony/ATV was and is obligated under the aforementioned contracts to make filings with the United States Copyright Office to protect, maintain the protection, and enhance the protection afforded to the "Let's Get It On" composition under the Copyright Act.

346.    Upon information and belief, Sony/ATV was and is also obligated under the aforementioned contracts to take steps to investigate potential infringement of the "Let's Get It On" composition, and to take steps to prevent and curb such infringement, including but not limited to through directing the initiation of legal action.

347.    Separate and apart from Sony/ATV's aforementioned obligations under the aforementioned contracts, Sony/ATV had and has an obligation at common law to make filings with the United States Copyright Office to protect, maintain the protection, and enhance the protection afforded to the "Let's Get It On" composition under the Copyright Act.

348.    Separate and apart from Sony/ATV's aforementioned obligations under the aforementioned contracts, Sony/ATV had and has an obligation at common law to take steps to investigate potential infringement of the "Let's Get It On" composition, and to take steps to prevent and curb such infringement, including but not limited to through directing the initiation of legal action.

349.     As discussed above, Sheeran himself performed a "mash up" of the two musical

works in concert on November 19, 2014, and by April 15, 2015, one or more of the Defendants

were placed on notice of claims that "Thinking Out Loud" infringes the copyright in the musical

composition "Let's Get It On."

350.     Upon information and belief, one or more of the Defendants, including EMI

Music Publishing, Sony/ATV, Sony Music, Sony Corporation of America, Sony/ATV and Stone

Diamond, were aware even earlier than April 15, 2015, and even earlier than the release of

"Thinking Out Loud" of the similarities between the works and the likelihood that "Thinking Out

Loud" infringed the copyright in "Let's Get It On."

351.     Upon information and belief, these Defendants not only failed to take action to

protect "Let's Get It On," failed to ensure that the owners of "Let's Get It On" would be

compensated by those responsible for the release of "Thinking Out Loud," but made the

affirmative decision to favor the interests of those who would benefit from "Thinking Out Loud"

over those who would benefit from enhanced protection for "Let's Get It On," and in doing so

violated their duties to SAS.

352.     Upon information and belief, these Defendants made the determination that they

had made, and would continue to make, more money by supporting the career of Sheeran, rather

than enhancing the protection for, and enforcing the rights of the owners of, the "Let's Get It

On" musical composition.


### LICENSING ANALYSIS – DANIEL RUBIN, ESQ.

353.     Plaintiff adopts as its allegations of fact the analysis set forth in the attached

report of Daniel Rubin, Esq., attached hereto and incorporated herein as **Exhibit C**, and detailed

in the following paragraphs.

354.    "Interpolations" refers to the creation of musical works and recordings that substantially copy or derived from existing works.

355.    For example, the instrumental melody from Puff Daddy's "I'll Be Missing You" is derived from a sample from the Police's "Every Breath You Take" and an interpolation of the vocal melody from the same song.

356.    In contrast, in Flo Rida's "Right Round" the chorus is interpolated entirely from "You Spin Me Round (Like A Record)" by Dead or Alive.

357.    The combination of elements, especially the instrumentation and underlying chord progression-bass line combination of "Let's Get It On," was featured throughout "Thinking Out Loud."

358.    The underlying chord progression-bass line combination from "Let's Get It On" is virtually identical to chord progression-bass line combination of "Thinking Out Loud."

359.    There are also striking similarities between the melodies and styles of the two works.

360.    Had an experienced licensing professional been asked by a client to advise them as to whether "Thinking Out Loud" should be cleared, said experienced licensing professional would have told them that it absolutely would need to be cleared, as the songs sound strikingly similar and that if they did not do so they would be looking at an infringement claim and that it could end up costing them a lot more after the fact.

361.    "Thinking Out Loud" represents at least a 80% use of "Let's Get It On," as judged under normal circumstances.

362.    When an interpolation is not cleared prior to release of the record and

subsequently becomes a copyright infringement case, the percentage often ranges as high as 100% copyright ownership, in additional to monetary damages.

363.   There are a number of factors that - if present - suggest higher percentages in the case of "Thinking Out Loud" as compared to "Let's Get It On."

364.   All of the following are present here and support a very high percentage, toward the top of the 80%-100% range:

a.   "Let's Get It On" was and remains a hugely popular song since its release in 1973. There are few songs that are so well-known. In the marketplace, the more successful and well-known the original song, the greater license dollars and rates it can command.

b.   Marvin Gaye was and remains one of the most influential artists in the history of popular music. Referencing his and Mr. Townsend's work also supports higher licensing fees and higher ownership rates for the owners of "Let's Get It On."

c.   Mr. Sheeran has enjoyed a meteoric rise in his popularity and success following the release of "Thinking Out Loud."  These factors also indicate a higher rate, as they can be attributed to some degree to the Sheeran work.

d.   Mr. Sheeran and the other Defendants are sophisticated for-profit players in the music industry. They surely knew the need to clear copyrights before releasing new songs.  Their decision to proceed without doing so also supports the highest of percentages, as well as the fact that it goes without saying that they paid no, much less any substantial upfront money as a down payment to license "Let's Get It On."

e. The 1973 copyright registration,  which was based on the sheet music by Edward Townsend and Marvin Gaye, has been strengthened by an additional copyright registration based on the 1973 sound recording by Marvin Gaye of "Let's Get It On."  The increased scope of protected rights further supports a high license percentage.

**FIRST CAUSE OF ACTION**
**(Willful Copyright Infringement – 17 U.S.C.  § 101, *et seq.*)**

365.    Plaintiff repeats and realleges each of the foregoing Paragraphs as though fully set forth herein.  The Defendants' reproduction, distribution, and public performances of the infringing work, "Thinking Out Loud" in the United States and internationally*,* continue to this day, and Defendants have not deigned to compensate the copyright owners of the Work (including SAS) for the use of the copyrighted work in "Let's Get It On".  The Defendants' reproduction, distribution, public performance, streaming, concerts, merchandizing, synchronization, licensing and economic exploitation of "Thinking Out Loud"*,* and authorizing others to do the same, infringes Plaintiff's exclusive rights under the Copyright Act.

366.    The conduct of the Defendants is knowing and willful.

367.    As a direct and/or proximate result of the Defendants' wrongful conduct, the Plaintiff has been irreparably harmed, suffered damage, and Defendants have profited in an amount in the amount of hundreds of millions of dollars and to be determined at trial.

368.    One or more of the Defendants infringed on Plaintiff's exclusive copyright in "Let's Get It On" when it distributed and sold sound recordings, including compact discs, phonorecords, digital downloads, licenses, streaming, ringtones, ringbacks, and all other economic exploitation and video recordings, embodying "Thinking Out Loud". Such

reproduction and release was wholly unauthorized, as it was without any license or consent of authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, Defendants have realized illegal revenues.

369.    The Defendants infringed Plaintiff SAS's exclusive copyright in "Let's Get It On" when they issued and/or authorized others to issue licenses to third parties for the use, publication, and exploitation of "Thinking Out Loud".  Said licenses were issued without any consent or authority from the copyright owners (including Plaintiff SAS) of "Let's Get It On," from which "Thinking Out Loud" was substantially copied.  By virtue of this unauthorized commercial exploitation, Defendants have realized illegal revenues.

370.    As a direct and/or proximate result of the Defendants' infringement on Plaintiff's exclusive copyright in "Let's Get It On", Plaintiff has suffered damages.  Said injuries are continuing and will not abate in the future.

371.    Defendant AEG and one or more of the other Defendants are also liable for vicarious copyright infringement, in that – in addition to the actions or omissions set forth above – said Defendants:

        a.    Had the right and ability to control and/or monitor and/or supervise others engaged in acts of direct infringement; and

        b.    Enjoyed a direct financial benefit from acts of direct copyright infringement.

372.    Upon information and belief, AEG has the right and ability to control, monitor and/or supervise the musical works Ed Sheeran performed in concerts, including hundreds of concerts at which Sheeran performed "Thinking Out Loud."

373.    Upon information and belief, AEG received a direct financial benefit, in the form

of a share of the revenues collected, at every concert at which Sheeran performed "Thinking Out Loud."

374.     Defendant AEG and one or more of the other Defendants are also liable for contributory copyright infringement, in that – in addition to the actions or omissions set forth above – said Defendants:

        a.     Knew or should have known that Sheeran was going to engage in acts of copyright infringement; and

        b.     Induced, caused or materially contributed to Sheeran's infringing conduct.

375.     Upon information and belief, AEG knew or should have known that Sheeran was going to perform "Thinking Out Loud" in concert.

376.     Upon information and belief, AEG induced, caused and materially contributed to Sheeran's performance of "Thinking Out Loud" in concert by serving as promoter of Sheeran's concerts, securing the venues for Sheeran's concerts, and making all necessary arrangements for Sheeran's concerts at which he performed "Thinking Out Loud."

377.     Pursuant to 17 U.S.C. § 504(c), the Plaintiff is entitled to statutory damages since the infringement occurred after the copyrights were registered.

### SECOND CAUSE OF ACTION (Breach of Contract of Administration Agreement against EMI Music Publishing, Sony/ATV, Sony Music, Sony Corporation of America and Sony Corporation)

378.     Plaintiff repeats and realleges each of the foregoing Paragraphs as though fully set forth herein.

379.     Stone Diamond is the legal owner of the copyright in the musical composition "Let's Get It On."  SAS is one of the beneficial owners of that same musical composition.

380.    Sony/ATV is the worldwide administrator of the "Let's Get It On" musical composition.

381.    Upon information and belief, one or more of EMI Music Publishing, Sony/ATV, Sony Music and Sony Corporation of America own, control or share Stone Diamond's copyright rights in the "Let's Get It On" musical composition.

382.    Upon information and belief, one or more of EMI Music Publishing, Sony Music and Sony Corporation of America own, control or share Sony/ATV's rights and obligations as worldwide administrator of the "Let's Get It On" musical composition.

383.    Upon information and belief, Sony/ATV's (and to the extent applicable, that of EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) worldwide administration of "Let's Get It On" is governed by one or more Administration Agreements between Sony/ATV, on the one hand, and Stone Diamond, on the other hand, or the corporate predecessors or successors/assigns of one or both of those companies.

384.    SAS made multiple requests of Sony/ATV and Stone Diamond for a copy of the Administration Agreements, on April 7, May 22, 2020, but those requests were refused – not a single piece of paper was provided.

385.    SAS has also made requests of Sony/ATV and Stone Diamond to take action to enhance the scope of copyright protection for the "Let's Get It On" musical composition, including by letter dated April 7, 2020, but those requests were also refused.

386.    SAS is a third-party beneficiary of the Administration Agreements.

387.    Upon information and belief, the Administration Agreements empower Sony/ATV (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) to take steps to do all of the following, among other things,

both within the United States and outside of the United States:

      a. collect royalties and other revenues arising from the exploitation of the "Let's Get It On" musical composition;

      b. file copyright registrations to protect the "Let's Get It On" musical composition; and

      c. bring legal actions against those who infringe upon the "Let's Get It On" musical composition.

388. Upon information and belief, the Administration Agreements require Sony/ATV (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) to exercise the foregoing rights in good faith, and to the fullest extent reasonably possible, to benefit the owners of the "Let's Get It On" musical composition.

389. Trust elements in a publisher-author relationship, or an administrator-owner relationship, come into play when the publisher tolerates infringing conduct or participates in it, as Sony/ATV (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) has done here. *See Mellencamp v. Riva Music Ltd.*, 698 F. Supp. 1154, 1159 (S.D.N.Y. 1988).

390. In addition, the Administration Agreements impose a duty of good faith and fair dealing between and among the parties to that contract and its beneficiaries, including SAS.

391. Sony/ATV (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) were certainly obligated to exercise good faith toward SAS, and not use the "Let's Get It On" musical composition for the purpose of fashioning a competing song to be sold in place of plaintiffs' song. Sony/ATV's actions (and to the extent applicable, those of EMI Music Publishing, Sony Music, Sony Corporation of

America and Sony Corporation) constituted a breach of contract and a breach of trust.  *See Nelson v. Mills Music, Inc*., 278 A.D. 311, 312, 104 N.Y.S.2d 605, 606–07 (App. Div. 1951), *aff'd*, 304 N.Y. 966, 110 N.E.2d 892 (1953).

392.    The law implied a promise on part of Sony/ATV (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) to endeavor to make "Let's Get It On" productive, since that is the very purpose of the assignment of rights and the correlative obligation to pay royalties.  If the evidence shows that Sony/ATV (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) intentionally permitted the copyright in "Let's Get It On" to be infringed by others, it would thereby have subjected itself to liability as a fiduciary to the plaintiffs.  *See Manning v. Miller Music Corp*., 174 F. Supp. 192, 195-96 (S.D.N.Y. 1959).

393.    Sony/ATV (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) is liable to SAS for breach of an implied obligation not to use "Let's Get It On" in a way that would deprive SAS of its right to royalties. *See Cortner v. Israel*, 732 F.2d 267, 272 (2d Cir. 1984).

394.    Upon information and belief, based on statements made by counsel for Sony/ATV and Stone Diamond to the United States District Court for the Southern District of New York, it is – and has always been – the position of Sony/ATV (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) that the scope of copyright protection for a musical composition is limited to what has been submitted to the United States Copyright Office as its "deposit copy."

395.    Thus, it is and has always been the position of Sony/ATV (and to the extent applicable, that of EMI Music Publishing, Sony Music, Sony Corporation of America and Sony

Corporation) that if one secures a registration with the United States Copyright Office for a musical composition, where the deposit copy submitted was "lead sheet" sheet music, the scope of protection is limited to what is reflected on that sheet music, and excludes anything found elsewhere, including in sound recordings of the composition.

396.    Thus, it is and has always been the position of Sony/ATV (and to the extent applicable, that of EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) that if one secures an additional registration with the United States Copyright Office for an already-registered musical composition, where the deposit copy submitted in connection with the original registration was sheet music, and the deposit copy submitted in connection with the second registration was a sound recording, the scope of copyright protection for the musical composition will be expanded.

397.    From the date of inception of the Administration Agreements through March 19, 2020, Sony/ATV (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) breached the Administration Agreements by failing to take steps to secure one or more additional copyright registrations, using sound recordings as deposit copies, to enhance the scope of copyright protection for the "Let's Get It On" musical composition in the United States and throughout the world.

398.    From the date of the release of "Thinking Out Loud" through March 19, 2020, Sony/ATV (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) breached the Administration Agreements by failing to take steps to bring actions for copyright infringement against the other Defendants in this case, due to the infringement of "Thinking Out Loud" of the "Let's Get It On" musical composition.

399.    On March 19, 2020, and again on April 7, 2020, SAS specifically requested that

Sony/ATV and/or Stone Diamond file a copyright registration with the United States Copyright Office for the musical composition "Let's Get It On," using a sound recording of the composition as deposit copy.  Counsel for Sony/ATV and Stone Diamond refused to do so.

400.    From March 19, 2020, Sony/ATV (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) and Stone Diamond have continued to refrain from and refuse to take any steps to enhance the scope of copyright protection for the "Let's Get It On" composition, or bring actions for copyright infringement overseas arising from the infringement of "Let's Get It On" by "Thinking Out Loud."

401.    SAS, as a third-party beneficiary of the Administration Agreements, has been harmed by Sony/ATV's (and to the extent applicable, that of EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) failure and refusal to take steps to enhance the scope of protection of the "Let's Get It On" composition, and their failure and refusal to bring infringement actions overseas over the "Thinking Out Loud" infringement.

402.    Sony/ATV's (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) actions and omissions have caused substantial waste of the value of the "Let's Get It On" musical composition, further damaging SAS.

403.    SAS has been damaged in an amount to be determined at trial, but which is expected to exceed $100 million, representing worldwide copyright infringement damages for the period 2014 to the present that have not been sought or obtained by virtue of Sony/ATV's and Stone Diamond's (and to the extent applicable, that of EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) refusals and failures to take action and to

do what was required of them to enhance and enforce the copyright throughout the world against infringers.

**THIRD CAUSE OF ACTION (Breach of Contract of Songwriting Agreements against Stone Diamond, EMI Music Publishing, Sony/ATV, Sony Music, Sony Corporation of America and Sony Corporation)**

404.     Plaintiff repeats and realleges each of the foregoing Paragraphs as though fully set forth herein.

405.     Stone Diamond is the legal owner of the copyright in the musical composition "Let's Get It On."  SAS is one of the beneficial owners of that same musical composition.

406.     Sony/ATV is the worldwide administrator of the "Let's Get It On" musical composition.

407.     Upon information and belief, one or more of EMI Music Publishing, Sony/ATV, Sony Music and Sony Corporation of America own, control or share Stone Diamond's copyright rights in the "Let's Get It On" musical composition.

408.     Upon information and belief, one or more of EMI Music Publishing, Sony Music and Sony Corporation of America own, control or share Sony/ATV's rights and obligations as worldwide administrator of the "Let's Get It On" musical composition.

409.     Upon information and belief, Stone Diamond's legal ownership of "Let's Get It On" (and to the extent applicable, that of EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) is governed by one or more Songwriting Agreements between Edward Townsend and/or Marvin Gaye, or the successors/assigns of one or both of those persons, on the one hand, and Stone Diamond, on the other hand, or the corporate predecessors or successors/assigns of that company.

410.     SAS made multiple requests of Sony/ATV and Stone Diamond for a copy of the

Administration Contracts, on April 7, May 22, 2020, but those requests were refused – not a single piece of paper was provided.

411.   SAS has also made requests of Sony/ATV and Stone Diamond to take action to enhance the scope of copyright protection for the "Let's Get It On" musical composition, including by letter dated April 7, 2020, but those requests were also refused.

412.   SAS is a third-party beneficiary of the Songwriting Agreements.

413.   Upon information and belief, through the Songwriting Agreements, Edward Townsend and/or Marvin Gaye granted Stone Diamond the so-called "publishers share" of the "Let's Get It On" musical composition, and Stone Diamond agreed to act as music publisher of that composition.

414.   Upon information and belief, the Songwriting Agreements empower Stone Diamond (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) to take steps to do all of the following, among other things, both within the United States and outside of the United States:

a.   collect royalties and other revenues arising from the exploitation of the "Let's Get It On" musical composition;

b.   file copyright registrations to protect the "Let's Get It On" musical composition; and

c.   bring legal actions against those who infringe upon the "Let's Get It On" musical composition.

415.   Upon information and belief, the Songwriting Agreements require Stone Diamond (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) to exercise the foregoing rights in good faith, and to the fullest extent

reasonably possible, to benefit the owners of the "Let's Get It On" musical composition.

416.    Trust elements in a publisher-author relationship, or an administrator-owner relationship, come into play when the publisher tolerates infringing conduct or participates in it, as Stone Diamond (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) has done here.  *See Mellencamp v. Riva Music Ltd.*, 698 F. Supp. 1154, 1159 (S.D.N.Y. 1988).

417.    In addition, the Songwriting Agreements impose a duty of good faith and fair dealing between and among the parties to that contract and its beneficiaries, including SAS.

418.    Stone Diamond (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) were certainly obligated to exercise good faith toward SAS, and not use the "Let's Get It On" musical composition for the purpose of fashioning a competing song to be sold in place of plaintiffs' song.  Stone Diamond's actions (and to the extent applicable, those of EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) constituted a breach of contract and a breach of trust.  *See Nelson v. Mills Music, Inc.*, 278 A.D. 311, 312, 104 N.Y.S.2d 605, 606–07 (App. Div. 1951), *aff'd*, 304 N.Y. 966, 110 N.E.2d 892 (1953).

419.    The law implied a promise on part of Stone Diamond (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) to endeavor to make "Let's Get It On" productive, since that is the very purpose of the assignment of rights and the correlative obligation to pay royalties.  If the evidence shows that Stone Diamond (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) intentionally permitted the copyright in "Let's Get It On" to be infringed by others, it would thereby have subjected itself to liability as a

fiduciary to the plaintiffs. *See Manning v. Miller Music Corp.*, 174 F. Supp. 192, 195-96 (S.D.N.Y. 1959).

420. Stone Diamond (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) is liable to SAS for breach of an implied obligation not to use "Let's Get It On" in a way that would deprive SAS of its right to royalties. *See Cortner v. Israel*, 732 F.2d 267, 272 (2d Cir. 1984).

421. Upon information and belief, based on statements made by counsel for Sony/ATV and Stone Diamond to the United States District Court for the Southern District of New York, it is – and has always been – the position of Sony/ATV (and to the extent applicable, EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) that the scope of copyright protection for a musical composition is limited to what has been submitted to the United States Copyright Office as its "deposit copy."

422. Thus, it is and has always been the position of Stone Diamond (and to the extent applicable, that of EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) that if one secures a registration with the United States Copyright Office for a musical composition, where the deposit copy submitted was "lead sheet" sheet music, the scope of protection is limited to what is reflected on that sheet music, and excludes anything found elsewhere, including in sound recordings of the composition.

423. Thus, it is and has always been the position of Stone Diamond (and to the extent applicable, that of EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) that if one secures an additional registration with the United States Copyright Office for an already-registered musical composition, where the deposit copy submitted in connection with the original registration was sheet music, and the deposit copy submitted in

connection with the second registration was a sound recording, the scope of copyright protection

for the musical composition will be expanded.

424.    From the date of inception of the Songwriting Agreements through March 19,

2020, Stone Diamond (and to the extent applicable, EMI Music Publishing, Sony Music, Sony

Corporation of America and Sony Corporation) breached the Songwriting Agreements by failing

to take steps to secure one or more additional copyright registrations, using sound recordings as

deposit copies, to enhance the scope of copyright protection for the "Let's Get It On" musical

composition in the United States and throughout the world.

425.    From the date of the release of "Thinking Out Loud" through March 19, 2020,

Stone Diamond (and to the extent applicable, EMI Music Publishing, Sony Music, Sony

Corporation of America and Sony Corporation) breached the Administration Agreement by

failing to take steps to bring actions for copyright infringement against the other Defendants in

this case, due to the infringement of "Thinking Out Loud" of the "Let's Get It On" musical

composition.

426.    On March 19, 2020, and again on April 7, 2020, SAS specifically requested that

Sony/ATV and/or Stone Diamond file a copyright registration with the United States Copyright

Office for the musical composition "Let's Get It On," using a sound recording of the

composition as deposit copy.  Counsel for Sony/ATV and Stone Diamond refused to do so.

427.    From March 19, 2020, Stone Diamond (and to the extent applicable, EMI Music

Publishing, Sony Music, Sony Corporation of America and Sony Corporation) and Sony/ATV

continued to refrain from and refuse to take any steps to enhance the scope of copyright

protection for the "Let's Get It On" composition, or bring actions for copyright infringement

overseas arising from the infringement of "Let's Get It On" by "Thinking Out Loud."

428.    SAS, as a third-party beneficiary of the Songwriting Agreements, has been harmed by Stone Diamond's (and to the extent applicable, that of EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) failure and refusal to take steps to enhance the scope of protection of the "Let's Get It On" composition, and their failure and refusal to bring infringement actions overseas over the "Thinking Out Loud" infringement.

429.    SAS has been damaged in an amount to be determined at trial, but which is expected to exceed $100 million, representing worldwide copyright infringement damages for the period 2014 to the present that have not been sought or obtained by virtue of Stone Diamond's (and to the extent applicable, that of EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation) refusals and failures to take action and to do what was required of them to enhance and enforce the copyright throughout the world against infringers.

430.    In addition, because of the fundamental breaches of Stone Diamond and Sony/ATV (and to the extent applicable, that of EMI Music Publishing, Sony Music, Sony Corporation of America and Sony Corporation), SAS has been deprived of the benefits of the Songwriting Agreements, and all of SAS's rights conferred thereunder should revert to SAS.

431.    In particular, as noted above, upon information and belief Edward Townsend and/or Marvin Gaye granted the publisher's share of the copyright in the "Let's Get It On" musical composition to Stone Diamond, in exchange for Stone Diamond's agreement to serve as the publisher of that composition, via the Songwriting Agreements.

432.    Stone Diamond and/or its corporate successors and/or assigns, however, have utterly failed to live up to their express and implied obligations arising under the Songwriting Agreements, to the counterparties and beneficiaries of that agreement, including SAS.

433.    Stone Diamond's breaches are material and willful, and so substantial and fundamental as to defeat the object of the parties in making the Songwriting Agreements. *See Callanan v. Powers*, 199 N.Y. 268, 284, 92 N.E. 747, 752 (1910); <u>*Nolan v. Sam Fox Pub. Co.*</u>, 499 F.2d 1394, 1397 (2d Cir. 1974),

434.    Because Stone Diamond's breaches are material, willful and so substantial and fundamental as to defeat the object of the parties in making the Songwriting Agreements, SAS is further entitled to any damages arising from the unjust enrichment of Stone Diamond and its successors and/or assigns.

435.    In addition to compensating SAS for the damages it has suffered, SAS should be compensated in a manner designed to reflect the efforts that SAS has undertaken for the benefit of all of the owners of the "Let's Get It On" musical composition, including efforts that should have been undertaken by Sony/ATV and Stone Diamond as worldwide administrator and legal owner of the composition, respectively.  SAS thus asks the Court to place 100% of the writers' and publishers' shares of the "Let's Get It On" musical composition into a constructive trust for the benefit of SAS.  In the alternative, SAS asks for an award of additional damages designed to eliminate any economic benefic enjoyed by Sony/ATV and/or Stone Diamond due to their ownership share of the "Let's Get It On" musical composition and the efforts of SAS herein.

**WHEREFORE,** the Plaintiff SAS respectfully request that judgment be entered against the enumerated Defendants, as follows:

A.    For judgment that all of the Defendants except Stone Diamond, by virtue of their involvement with the creation, reproduction, public performance and distribution of "Thinking Out Loud," have violated the Copyright Act and that all such violations have been willful;

B.     For judgment that Defendants Sony/ATV (and to the extent applicable EMI Music Publishing, , Sony Music, Sony Corporation of America, Sony Corporation), as worldwide administrators of "Let's Get It On," have breached their contractual obligations to Plaintiff, causing damages equal to – at a minimum – the damages that could have been secured by (a) securing copyright registrations for the musical composition "Let's Get It On," using sound recordings of "Let's Get It On" as the deposit copy in connection with the applications for such registrations; and (b) bringing copyright infringement actions in multiple jurisdictions around the world immediately upon the initial release of "Thinking Out Loud,"

C.     For judgment that Defendants Stone Diamond (and to the extent applicable EMI Music Publishing, Sony Music, Sony Corporation of America, Sony Corporation), as publisher of "Let's Get It On," have breached their contractual obligations to Plaintiff, causing damages equal to – at a minimum – the damages that could have been secured by (a) securing copyright registrations for the musical composition "Let's Get It On," using sound recordings of "Let's Get It On" as the deposit copy in connection with the applications for such registrations; and (b) bringing copyright infringement actions in multiple jurisdictions around the world immediately upon the initial release of "Thinking Out Loud," as well as any damages necessary to compensate Plaintiff for the unjust enrichment of Stone Diamond and its successors and/or assigns, and – to the extent the Court deems it necessary – placement of 100% of the writers' and publishers' shares of the "Let's Get It On" musical composition into a constructive trust for the benefit of SAS, or, in the alternative, an award of additional damages designed to eliminate any economic benefic enjoyed by Sony/ATV and/or Stone Diamond due to their ownership share of the "Let's Get It On" musical composition and the efforts of SAS herein; and

D.     For judgment assessing Defendants for the damages in excess of one hundred million dollars ($100,000,000.00) suffered by Plaintiff, including an award of actual damages and Defendants' profits attributable to the infringement, or statutory damages (at Plaintiff's election) under the Copyright Act, as well as costs and attorney's fees to the full extent provided for by Sections 501, 504 and 505 of the Copyright Act, 17 U.S.C. §§ 501, 504 and 505; damages and profits shall include all profits and damages resulting from exploitation of the work domestically and internationally, as well as any and all profits and damages in the following categories attributable to the infringement, including but not limited to:

1.     Record sales;
2.     Downloads;

3.      Ringtones;
4.      Ringback tones;
5.      Public performance revenues;
6.      Digital revenue;
7.      Streaming revenue;
8.      Synchronization licensing;
9.      Merchandising;
10.     Public appearances;
11.     Endorsements;
12.     Sponsorships;
13.     Spokesperson work;
14.     Touring revenue, including but not limited to revenue collected by the Defendants for Sheeran's performances at concerts that included his performance of "Thinking Out Loud";
15.     Advertising revenue;
16.     Appearance fees;
17.     Name and likeness income and increase in value;
18.     Rights of publicity income and increase in value;
19.     Increased value of all Defendants' publishing and/or record company and/or companies;
20.     Increased value of all Defendant's, including Sheeran's catalog;
21.     Increased value of music publishing and/or record royalties and rights;
22.     Increased value of social media rights, accounts and value;
23.     Increased goodwill;
24.     Promotional value;
25.     Increased value of royalty rate for record deals;
26.     Increased value in distribution deals, negotiating power and reduction in costs;
27.     Value of obtaining lower cost of administration fees and/or increased advances for publishing deals;
28.     Value of obtaining better terms for record company advances and terms and multi-record deals;
29.     Value of obtaining better terms of publishing and/or recorded master deals for Sheeran's existing catalogue and for future works;
30.     Increased value in negotiating 360 deals with record companies and/or publishers;
31.     Sheet music sales and sheet folio income;
32.     Any and all music publisher income;
33.     Any and all record master income;
34.     Any and all record income;
35.     Any and all SoundExchange, BMI, ASCAP, PRS, SESAC, PPL, SOCAN, MCPS, Harry Fox Agency, and any and all collection

society, mechanical society and performance society income
worldwide;

36.     Any and all producer royalty income;

37.     Any and all arrangement income;

38.     Any and all income derived from any existing medium or any
medium hereinafter developed worldwide;

39.     Any and all income from any new collection society and/or
collection agency to be created anywhere in the world, including
by the U.S. Congress under the Music Modernization Act;

40.     Any and all income from any society to which any Defendant
belongs or joins in the future;

41.     Any and all income and/or residuals from SAG-AFTRA;

42.     Any and all income from Apple, iTunes, Amazon, Spotify,
Pandora, Rhapsody, and any and all download and streaming
services; and

43.     Any and all of Defendants' equity interests in Spotify, and any
other music streaming or download services or companies in
which one or more Defendant has an interest, as it relates to the
value from the inclusion of the infringing song in the service; and

E.     For judgment granting such other, further, and different relief as to the
Court may seem just and proper, including Plaintiff's costs and
reasonable attorneys' fees.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury as to all issues triable by jury, as enumerated and set forth in more detail in this

Complaint.

Dated:  New York, New York
June 8, 2020

PARNESS LAW FIRM, PLLC

By:_____/s/ Hillel I. Parness_____
Hillel I. Parness
136 Madison Ave., 6th Floor
New York, New York  10016
(212) 447-5299
hip@hiplaw.com
*Attorneys for Plaintiff*

*Structured Asset Sales, LLC*